## APPEAL OF NAZARETH CEMENT COMPANY.

Docket No. 2446.    Decided September 27, 1926.

A corporation purchased tangible property for $2,500,000 cash, derived from bonds and preferred stock issued at its organization, and, during the following six-year period, it was obliged to borrow $400,000 to meet interest charges on its bonds. A reorganization being necessary, the property was bought in at an agreed foreclosure sale by representatives of creditors and preferred stockholders at a nominal price and thereafter was transferred to the petitioner corporation, which issued to creditors, bondholders and preferred stockholders of the old corporation $2,500,000 of preferred and common stock. *Held*, that the petitioner was a new corporation and acquired the property of the old corporation in exchange for stock, that the property so acquired had an actual cash value at the time paid in, in February, 1906, of $1,650,000, and that in computing the invested capital for the years involved this amount should be included therein.

*Luther F. Speer, Esq.*, and *Fred A. Woodis, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the Commissioner.

This is an appeal from the determination of deficiencies in income and profits taxes for the years 1917, 1918, and 1919, in the amount of $89,113.25. The deficiencies asserted for the respective years are: 1917, $25,244.21; 1918, $31,947.33; 1919, $31,921.71.

### FINDINGS OF FACT.

The petitioner is a Pennsylvania corporation with principal office at Easton. It is successor to a corporation of the same name organized under the laws of Pennsylvania in 1900. At or about the date of the organization of the predecessor company, there was paid in $2,500,000 cash, for which $1,250,000 of preferred stock and $1,250,000 of bonds were issued by the predecessor company, with which bonds and stock there was also issued, without further consideration, $1,250,000 par value of common stock. With the $2,500,-000 of actual cash paid in to the predecessor company, that company purchased 156 acres of cement-bearing shale rock and erected a plant thereon for the conversion into cement of the rock taken from the quarries on the land. The total cost to the predecessor company of the land, quarries and plant erected exceeded $2,500,000. Shortly after the organization of the predecessor corporation in 1900, it was discovered that cement could be produced from the constituent materials of different formations, with the result that many cement mills began operations in different sections of the country. The Nazareth Cement Co. was the first company in the

50144°—27——74

Lehigh region to embark upon the industry on a large scale. A few years after its organization a number of other large mills began operations in that immediate vicinity. The petitioner's operations were not profitable. No common or preferred stock dividends were ever paid and the accumulated interest on its bonded indebtedness was large in amount. In order to carry on its business the company was compelled from time to time to borrow from outside sources amounts aggregating $400,000. In 1906 the predecessor company found itself unable to meet its fixed charges of interest upon its bonds and other indebtedness, and under the circumstances the interested parties concluded that a reorganization of the company was necessary. Due to the fact, however, that certain of the bondholders were not in a position to consent to the reorganization, it was decided that the creditors should foreclose upon their mortgage and that the property should be sold and a new corporation organized to take over the business and properties. This plan was carried out by an agreed foreclosure sale wherein the property of the predecessor company was bought in by the representatives of the creditors at a nominal amount of $9,000.

Upon the conclusion of the judicial sale and the transfer of the property of the predecessor corporation into the hands of the trustee, and after 30 days' notice, as required by the Pennsylvania laws, as hereinafter referred to, a meeting was held and the officers and directors of the former corporation were elected officers and directors of the new corporation, the petitioner herein. The new corporation issued $2,500,000 preferred and common stock to the creditors and preferred stockholders of the former corporation. The preferred stock was issued to the creditors holding $400,000 of obligations of the company and to the holders of $1,250,000 par value of bonds, par for par, including accrued interest upon the obligations. To the preferred stockholders of the predecessor company who were also the holders of all its common stock, there was issued common stock of the petitioner in an amount equal to 50 cents on the dollar of their preferred stock. No stock in the new corporation was issued for the common stock of the predecessor.

Due to a disagreement between the principal officers of the corporation, the corporate books and records were removed from the company's office. They were lost, with the result that the information contained therein concerning the company's property is not now available.

Under date of November 12, 1920, the Commissioner notified the petitioner of an additional tax based upon an audit of its returns for the years here in question, in which he computed its invested capital by including in full the capital stock mentioned above. At

that time the Commissioner, using the invested capital computation set forth above, computed a deficiency in tax for the years here in question amounting to $32,498.97, which was paid. Thereafter, on January 1, 1921, the same Commissioner determined that he had erred in computing the invested capital, and he reopened the case. While the case was pending further consideration, the present Commissioner assumed office, on May 27, 1921, and he thereafter held that he could not determine the invested capital and computed a further tax upon the basis of representative concerns under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918. Under this computation there was found the further deficiency as ultimately set forth in the notice of the deficiency mailed to the petitioner and constituting the basis of this appeal.

OPINION.

LITTLETON: The petitioner advances two contentions: First, that the Commissioner, having once determined the tax, could not reverse such determination and compute a tax upon a different basis resulting in a greater deficiency, and, secondly, that it was permissible and proper, in computing the invested capital, to look through the reorganization of 1906 and compute the invested capital upon the basis of that of the predecessor company.

As to the first issue, the contention of the petitioner is not well taken. *Appeal of Dallas Brass & Copper Co.*, 3 B. T. A. 856; *Appeal of Warner Sugar Refining Co.*, 4 B. T. A. 5.

As to the second claim advanced, we are of opinion that the petitioner was an entirely new corporation and that it acquired the property of the predecessor corporation for stock from the creditors who had purchased it at a foreclosure sale. Petitioner's invested capital was the actual cash value of the property paid in.

The petitioner was organized pursuant to the laws of Pennsylvania, Pa. Stat. 1920, sections 5805, 5806, and 5807. Section 5805 (Act of June 20, 1911; P. L. 1092, section 1) provides as follows:

Purchasers of franchises and property to be a body politic; powers—Whenever material, rolling-stock or property, whether located wholly or partly within this State, and franchises, or all or any part of such material rolling-stock. property and franchises, of any gas, water, coal, iron, steel, lumber, oil, or mining or manufacturing, transportation or telegraph company, or any railroad, canal, turnpike, bridge, or plank road, or of any corporation created by or under any law of this State, or of this State and any other State or States, shall be sold and conveyed, under and by virtue of any process or decree of any court of this State or of the United States, or under or by virtue of a power of sale contained in any mortgage or deed of trust, without any process or decree of a court in the premises, the person or persons for or on whose account such material, rolling-stock, property, and franchises of any gas, water, coal, iron, steel, lumber, oil, or mining, or manufacturing, trans-

portation or telegraph company, or any railroad, canal, turnpike, bridge, or plank road, or of any corporation created by or under any law of this State or of this State and any other State or States, so sold and conveyed, may be purchased, shall be and they are hereby constituted a body politic and corporate, and shall be vested with all the right, title, interest, property, possession, claims, and demand, in law and equity, of, in and to such material rolling-stock, property, or franchise, so sold and conveyed, of any gas, water, coal, iron, steel, lumber, oil or mining, or manufacturing, transportation, or telegraph company, or any railroad, canal, turnpike, bridge or plank road, or of any corporation created by or under any law of this State, or of this State and any other State or States, with the appurtenances, and with all the rights, powers, immunities, privileges, and franchises of the corporations as whose the same may have been sold, and which may have been granted to or conferred thereupon by any act or acts of Assembly whatsoever, in force at the time of such sale and conveyance, and subject to all the restrictions imposed upon such corporations by any such act or acts, except so far as the same are modified hereby, or have been by any amendments or supplements thereto or modifications thereof; and with all the rights, powers, immunities, privileges, and franchises granted to or conferred by acts now existing upon corporations of a similar kind, and subject to all restrictions imposed by statute, except as subsequently modified, or modified hereby; and the person or persons purchasing, for or on whose account any such material, rolling-stock, property and franchises of any gas, water, iron, steel, lumber, oil, or mining, or manufacturing, transportation or telegraph, company, or any railroad, canal, turnpike, bridge, or plank road or of any corporations created by or under any law of this State, or of this State and other State or States, so sold and conveyed, may have been purchased, shall meet, within thirty days after the conveyance thereof shall be delivered,—public notice of the time and place of such meeting having been given, at least once a week for two weeks, in at least one newspaper published in the city or county in which such sale may have been held,— and organize said new corporation by electing a board of directors consisting of not less than five nor more than fifteen (to continue in office until the first Monday succeeding such meeting, when, and annually thereafter on the said day, a like election for directors shall be held, the directors so elected to serve for one year and until their successors are elected, unless the directors shall be divided into not more than four classes, in which case the term of office of one class shall expire on each first Monday of May thereafter), and shall adopt a corporate name and common seal, determine the amount of the capital stock thereof, without being restricted to the amount theretofore issued by the corporation whose property and franchise had been sold. Not in excess, however, of the aggregate amount of the capital stock authorized to be issued by the corporation whose property and franchises had been sold, together with the amount of the bonded indebtedness of such corporation outstanding at the time of the sale, and of any receiver's certificate or other receiver's indebtedness necessary to be paid, and the amount that will represent all further moneys contributed to such new, or reorganized corporation. The said stock thus issued by the said new corporation may consist wholly of common stock, or partly of common stock and partly of preferred stock; and the whole, or any part thereof, may be issued as fully paid stock, in payment or part payment for the property so purchased. Said new corporation shall have power and authority to make and issue certificates therefor, in shares of not more than one hundred dollars each; and may at any time thereafter create and issue preferred stock to such an amount and on such terms as

such corporation may deem necessary; and, from time to time, may issue bonds to any amount, and may secure the same by one or more mortgages upon the real and personal property and corporate rights and franchises, or either, or any part or parts thereof: Provided, That no coal, iron, steel, lumber, or oil, or mining, manufacturing, transportation or telegraph company, shall have the benefit of this act, unless it shall have previously filed with the Secretary of State its acceptance of all the provisions of the Constitution as provided by law.

Section 5806 (Act of May 23, 1919; P. L. 240, section 1) validates ownership of purchasers from corporations prior thereto.

Section 5807 (Act of May 25, 1878; P. L. 145, section 2, provides as follows:

New corporation to file certificate with secretary of state—It shall be the duty of such new corporation, within one calendar month after its organization, to make a certificate thereof, under its common seal, attested by the signature of its president, specifying the date of such organization, the name so adopted, the amount of capital stock, and the names of its president and directors, and transmit the said certificate to the secretary of state, at Harrisburg, to be filed in his office and there remain of record; and a certified copy of such certificate, so filed, shall be evidence of the corporate existence of said new corporation.

Under these statutes the petitioner upon its organization became a new corporation separate and distinct from the former corporation to the same extent as if it had been organized under an original charter to take over the property and assets of the predecessor company. Its invested capital for the years involved was therefore the actual cash, the actual cash value of property paid in for stock, and paid-in or earned surplus and undivided profits. In these circumstances, petitioner's invested capital, in so far as the property formerly owned by the old corporation was concerned, was its actual cash value at the time paid in for stock in 1906. The evidence before the Board relative to that value is that the creditors, holding claims in the amount of $1,650,000, consented to the organization of a new company and agreed that, in lieu of being paid the amount of their indebtedness and accrued interest, they would purchase the property at a foreclosure sale at a nominal price and pay the same in to the new corporation for $1,650,000 par value of the preferred stock in exchange for the entire property representing an investment by the old company of $2,500,000. Upon the transfer of the properties of the old corporation, $1,650,000 par value of preferred stock was issued to the creditors holding claims in that amount, and $900,000 par value of common stock was issued to the holders of all of the preferred stock of the predecessor corporation upon the basis of 50 cents on the dollar, together with accumulated dividends. The petitioner had the same officers and directors as its predecessor who had been connected with the enterprise since its inception in 1900.

They, as well as the creditors, were thoroughly familiar with the properties and their probable value. The creditors were willing to surrender their claims for preferred stock of the petitioner.

The conditions which necessitated the organization of the petitioner were occasioned by the increased production of cement as a result of several other large companies beginning operations in the Lehigh region prior to 1906. Petitioner's operations have been profitable, although it produced no more cement than did its predecessor.

Upon the entire record we are of opinion that the property paid in to the petitioner for stock had an actual cash value at the time of $1,650,000. Invested capital for the years involved should therefore be computed by including this amount therein.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*