AMERICAN SECURITY & TRUST CO. et al.
v. TAIT, Collector of Internal Revenue.

HERRMANN v. SAME.

Nos. 4720, 4721.

District Court, D. Maryland.

Dec. 9, 1933.

Laurence Graves, of Washington, D. C., for plaintiffs.

Simon E. Sobeloff, U. S. Atty., and Charles G. Page, Asst. U. S. Atty., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

These cases are identical with respect to the underlying facts and legal principles. In both the plaintiffs are seeking to recover alleged over-payments of income taxes under

the Revenue Act of 1918 (40 Stat. 1057), for the year 1919. The cases differ only as to the amount of the tax in dispute. For simplicity, the figures herein mentioned are taken from the first case. The plaintiffs in that case are executors of B. F. Saul, who was the taxpayer. After payment of the deficiency assessment made by the Collector, a petition for refund was filed and denied.

The disputed item of income grew out of a stock transaction of the taxpayer in the year 1919. The controlling facts and legal proceedings giving rise to the present controversy are set out in complete detail in the third and fourth special counts of the declaration to which demurrers have been filed by the defendant. Counsel are agreed that the legal merits of the controversy are fully presented in the form now raised; that is to say, the determination of the demurrer will lead to a final disposition of the cases here without the necessity of a trial on the facts.

In 1919 B. F. Saul, a resident of Washington, D. C., was president of the Home Savings Bank (hereinafter referred to as the "Bank"), of that City, and its largest stockholder holding 479 shares out of a total of 1,000 shares of the par value of $100 each. Early in 1919 he was approached by the president of the American Security and Trust Company (hereinafter referred to as the "Trust Company"), also a Washington financial institution, with a proposal to merge the Bank with the Trust Company. They agreed upon terms satisfactory to all the stockholders of the Bank and the American Security and Trust Company, which was a much larger institution, having outstanding 30,000 shares of the par value of $100 per share (with a market value of $220 per share). The basis on which the merger was finally effected involved an increase of the authorized and issued stock of the Trust Company by 4,000 shares of the par value of $100 each, and the stockholders of the merged bank received for each share of their stock, four shares of Trust Company stock. A local statute of the District of Columbia provided that the stock of certain financial institutions, including that of the Trust Company, could be issued only for cash. The legal corporate proceedings resulting in the merger were provided for in a written agreement dated March 18, 1919, by and between (1) all the stockholders of the Bank; (2) the Bank itself; (3) Saul and two other persons as trustees and (4) the Trust Company. The agreement is fully set out in the declaration, and also in 4 B. T. A. 641, 642. The plan, which was afterwards carefully carried out by formal and regular corporate action on the part of both corporations, stated in much abridged form, provided for (a) the deposit of the Bank stock with voting proxies with the trustees to hold until the receipt of 4,000 shares of Trust Company stock and then to hold the Bank stock subject to the direction of the Trust Company; (b) the transfer of the assets of the Bank to the Trust Company for $400,000; (c) the repayment of the $400,000 to the Trust Company for 4,000 shares of its stock and (d) the distribution of the Trust Company stock to the Bank stockholders, four for one.

In his return for the taxable year of 1919 the taxpayer treated this transaction as a *sale* of his bank stock at $400 per share and reported the income therefrom as the difference between the proceeds of said sale and his cost or March 1, 1913 value, to wit, $32,840. However, the Commissioner of Internal Revenue declined to treat the transaction as a sale and determined it to be an exchange of stock in connection with a *merger* under section 202 (b) of the Revenue Act of 1918 (40 Stat. 1057, 1060) which reads as follows:

"(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, *merger,* or consolidation of a corporation *a person receives in place of stock or securities owned by him new stock or securities* of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

"When in the case of any such reorganization, *merger* or consolidation the aggregate par or face value of the *new stock or securities received* is in excess of the aggregate par or face value of the stock or securities *exchanged,* a like amount in par or face value of the new *stock or securities received* shall be treated as taking the place of the *stock or securities exchanged,* and the amount of the excess in par of face value shall be treated as a gain to the extent that the fair market value of the new stock or securities is greater than the cost (or if acquired prior to March 1, 1913, the fair market value as of that date) of the stock or securities exchanged." (Italics supplied.)

And thereupon he determined that the

profit or income was $143,700 which, with other adjustments, resulted in a deficiency in the tax in the amount of $64,274.73. Thereafter the taxpayer duly filed an appeal with the United States Board of Tax Appeals insisting that the transaction involved a sale only and not an exchange of stock in connection with a corporate merger. The appeal was heard by the Board on October 27, 1925, the Commissioner of Internal Revenue not asserting any greater deficiency than that found by him but re-asserting that the transaction was an exchange and not a sale. On July 31, 1926, the Board of Tax Appeals promulgated its findings of fact and opinion reported in F. C. West Corp'n v. Commissioner, 4 B. T. A. 629; and on April 14, 1927, the Board entered its order of re-determination fixing the deficiency in the tax in the amount of $144,897.95, an increase of $80,623.32 over the deficiency tax as determined by the Commissioner.

In its opinion the Board held that the transaction was a sale as contended for by the taxpayer and controverted by the Commissioner, but the Board also held that the total consideration received by the taxpayer was not limited to the sum of $400 per share for his Bank stock but also included the right to buy at the par of $100 four shares of the Trust Company's stock for each share of Bank stock held by him, the value of the Trust Company stock being $220 per share. That is to say, the taxpayer's total profit was computed as the difference between his cost or March 1, 1913 value for his Bank stock and the sale thereof at $880 per share.

Thereafter the Commissioner of Internal Revenue assessed a deficiency tax against the taxpayer in the amount of the deficiency as found and re-determined by the Board and, upon notice to pay, after receiving an extension of time for payment with accumulating interest, the taxpayer paid the whole tax with interest as so finally assessed by the Commissioner, and brought this suit after denial of petition for refund.

The third count of the plaintiffs' declaration presents the legal proposition that on the facts so stated the plaintiffs are entitled to recover the whole of the tax paid over and above the amount reported in the original return; while under the fourth count of the declaration the proposition presented is that the plaintiffs are entitled to recover the difference between the amount of the tax as originally determined by the Commissioner (without the increase resulting from the re-determination by the Board), and the amount finally actually paid.

As this is a suit for a refund the burden is on the plaintiffs to show that the tax has been over-paid, and the defendant, therefore, has received moneys from the plaintiffs which, in equity and good conscience, ought to be returned. Lewis v. Reynolds, 284 U. S. 281, 52 S. Ct. 145, 76 L. Ed. 293. The basic question for determination is, therefore, What was the tax properly due and owing from the taxpayer to the United States. The particular question in this case is whether the stock transaction is to be treated as a sale or as *an exchange of stock under the special provisions of the 1918 Act above quoted;* that is to say (in the very language of the Act), did the taxpayer *receive,* in place of stock or securities owned by him, new stock or securities, in connection with a *merger.* It may be noted that the precise question is not merely whether there was a "sale" or "exchange" in the ordinary meaning of the two words, but is whether there was an exchange in the sense comprehended by the words of the statute above quoted. But for convenience the question may be briefly referred to in the discussion as "sale or exchange."

A careful analysis of the contract for the merger of the Bank and the Trust Company convinces me that the action of the Commissioner in treating the transaction as an exchange of stock under the provisions of the 1918 Act was right and the conclusion of the Board, in its carefully considered opinion, was wrong. It is not denied in this case that the transaction constituted a *merger* of the Bank and the Trust Company within the measure of the Act. In fact the contract expressly stated that the purpose of the parties was "to effect said merger by the transfer of the assets of the Bank, including all of its real and personal property, to the Trust Company." Nor is it denied that the transaction resulted in the *receipt* by the taxpayer of new Trust Company stock for old Bank stock. Nor can it be denied that the contract was an entire and indivisible one, though proceeding to accomplish its ultimate purpose by separate steps toward the completed result.

So far as the stockholders of the Bank are concerned they never agreed to part with their Bank stock except upon the condition of the receipt of four shares of Trust Company stock for each share of Bank stock. The agreement contains four paragraphs which state the obligations and promises of the respective parties to the agreement. Thus, in paragraph 1 is contained the agreement of the stockholders; in paragraph 2,

that of the Bank; in paragraph 3, that of the Trustees, and in paragraph 4, that of the Trust Company. Looking at the first paragraph we find that the stockholders therein agreed (a) to deposit their stock with the Trustees in negotiable form; (b) to give the Trustees proxies to vote at a stockholders' meeting and to authorize the directors, "to pass such resolutions as may be necessary to effect said merger by the transfer of the assets of the Bank, including all of its real and personal property, to the Trust Company; and (c) "to authorize said Trustees to hold the stock of the Bank so deposited with the Trustees until delivery to the Trustees by the Trust Company of 4,000 shares of its capital stock and then to hold the stock of the Bank subject to the direction of the Trust Company." On its part, the Bank agreed to hold the necessary corporate meetings to authorize "the transfer of all the assets of the Bank to the Trust Company for and in consideration of the assumption by the Trust Company of all the liabilities of the Bank, other than its liabilities to its stockholders, and for and in consideration of the satisfaction of the interest of its stockholders, by the payment of the sum of $400,000 to the Trustees." The Trustees agreed that, upon receipt of $400,000 *and* 4,000 shares of Trust Company stock, they would pay the Trust Company $400,000 therefor and hold the stock of the Bank subject to the direction of the Trust Company and thereupon transfer "to each stockholder of the Bank four shares of the stock of the Trust Company for each one share of stock of the Bank delivered by such stockholder." The Trust Company agreed to hold corporate meetings to increase its capital stock by $400,000 and to issue and deliver the same to the Trustees upon payment by the latter of $400,000 to the Trust Company.

Neither in form nor in economic substance did this contract constitute a sale as contended by the taxpayer. It contains no appropriate language to indicate a sale of the stock. On the contrary, it does contain language which shows clearly that so far as the stockholders were concerned they were making an exchange of their stock because the Trustees with whom the Bank stock was deposited were not authorized to relinquish or deliver the same except upon the express condition of the contemporaneous receipt of Trust Company stock. How far this contract differs in form from a sale of the stock is apparent by comparison with the contract considered in Wright v. Commissioner (C.

C. A. 4) 50 F.(2d) 727, an income tax case under the 1918 law.

The course this tax controversy has taken would seem to be primarily due to the contention of the taxpayer before the Commissioner and before the Board of Tax Appeals that the transaction must be treated as a sale of the Bank stock at $400 per share, and the taxable income resulting limited thereto. This contention is clearly untenable. In effect it divides an indivisible contract into two separate contracts, one of sale of the Bank stock at $400 a share and the other a subscription at the par of $100 to four shares of Trust Company stock, each having a market value of $220 per share. To treat an entire and indivisible contract this way not only violates the elementary rules of the construction of contracts but from the economic standpoint, injects an atmosphere of unreality in erecting the hypothesis that a stockholder who could obtain a value equal to $880 per share for his Bank stock actually sold it for $400.

The Board, against the contention of the Commissioner to the contrary, adopted the taxpayer's contention that the transaction constituted a sale of the Bank stock, but held that the total consideration for the sale was to be measured by the value of the Trust Company stock actually received in exchange. The conclusion seems to me to involve a double fallacy. The same legal considerations which prevent the taxpayer from treating the transaction as a sale apply equally to the Board's decision to that effect, and the Board's action is open to the further objection that for the purpose of determining the nature of the transaction it characterizes it as a sale but measures the amount of the tax by the value of the Trust Company stock received in exchange by the taxpayer. This conclusion seems to me to involve a vital inconsistency. Cf. Mullins v. Commissioner, 14 B. T. A. 426.

As appears from the opinion of the Board, its conclusion that the transaction was a sale was based on the consideration that under the local banking law in the District of Columbia the Trust Company could not properly directly exchange its stock for the stock of the Bank but could issue new stock only for actual cash. This view of the matter seems to me to place undue emphasis on the local banking law and give too little importance to the effect of the national income tax law. Doubtless the contract was cast in the particular form it took to meet the requirements of the local banking law but the ques-

tion with which we are here concerned deals primarily with the application of the income tax law rather than with the local banking law. In form, at least, the transaction did comply with the local banking law and the Comptroller of the Currency so determined. All that that law required was that the new Trust Company stock should actually be paid for in cash. The Board seems to have assumed that this could not have been done unless the cash resulted from a sale of the Bank stock. But this is an unnecessary assumption. It was immaterial from the standpoint of banking law how the cash was provided, provided only that it was real. There were various ways in which the cash might have been provided other than the one actually adopted in the contract. As a matter of fact the contract actually provided that the cash should come from a sale of the assets of the Bank rather than from a sale of the stock.

There is another and perhaps more compelling reason for not allowing the local law (with its consequent effect on the form of the contract) to dominate in the application of the income tax law. If the taxpayer's proportionate interest in the cash sum of $400,-000 in this case had reflected a loss as compared with his cost or March 1, 1913, value for his Bank stock, it would seem clear that he would not be permitted to take deduction for the loss in his income tax return and thus disregard the effect of the contract as a whole resulting in an exchange of stock in the merger. See Howard v. Commissioner (C. C. A. 6) 56 F.(2d) 781, certiorari denied 287 U. S. 619, 53 S. Ct. 19, 77 L. Ed. 537, relating to a situation more closely parallel to the instant case than any other that I have noted.

In applying the income tax law to varied and sometimes complex intercorporate stock transactions two principles have heretofore been enunciated, (1) that regard must be had for substance rather than form, Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; Schoenheit v. Lucas (C. C. A. 4) 44 F.(2d) 476; and (2) that "what was done, rather than the design and purpose of the participants, should be the test," United States v. Phellis, 257 U. S. 156, 172, 42 S. Ct. 63, 67, 66 L. Ed. 180; or, as the Board has expressed it, income tax liability "must be determined by what was actually done rather than the effect of what was done," 4 B. T. A. 647. In reaching its conclusion the Board was apparently controlled by the consideration that the latter principle was dominant in its application to the particular case, and, so applied, required the treatment of the several steps taken in the corporate transaction to be each regarded as a matter of substance and not of form. But here (as in United States v. Phellis, and in Weiss v. Stearn, 265 U. S. 242, 254, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520) there is no collision between these two principles if we treat the contract, as we must, as an entire and indivisible contract. In result the Board divided an otherwise indivisible contract into two separate and independent agreements.

In Prairie Oil & Gas Co. v. Motter (C. C. A. 10) 66 F.(2d) 309, 311, a somewhat similar effort by the Collector to divide an entire transaction into two separate steps, in order to make a sale constitute a "reorganization" under the 1926 Act (26 USCA § 934 (h) (1) was condemned, the Court, by Circuit Judge McDermott, saying:

"To avoid this conclusion the collector then undertakes to separate the component parts of this single transaction. * * * If a taxpayer sought to avoid a tax on the profits of such a sale as this by asking the Commissioner to ignore the actualities, he would shortly and properly be reminded that taxation is an intensely practical matter and that the substance of the thing done, and not the form it took, must govern. A similar effort to treat two steps in a single transaction as two separate transactions was rejected by this court in Tulsa Tribune Co. v. Commissioner, 58 F.(2d) 937, 940, wherein we said:

"'As it seems to us, the attempt to break this transaction up into two elements by saying that Jones bought the property and then transferred it to the corporation in exchange for its capital stock is not only unfair, but untrue.'"

There is, of course, no question in this case that the transaction resulted in taxable income. The sole question is what is the proper tax. The question as to sale or exchange becomes important only by reason of the special provision of the 1918 Act above quoted which first introduced a special formula for the computation of the tax on income resulting from an exchange of stock in connection with a reorganization, merger or consolidation of corporations. In later Acts this special formula has been developed in more detail. See Cortland Specialty Co. v. Commissioner, 60 F.(2d) 937 (C. C. A. 2), certiorari denied, 288 U. S. 599, 53 S. Ct. 316, 77 L. Ed. 975; Prairie Oil & Gas Co. v. Commissioner, supra. The general purpose

342

of Congress in providing this special formula was to effect a more equitable tax and thus not discourage ordinary corporate transactions. If this case had arisen prior to the effective date of the 1918 Act, the taxpayer would have been liable for the amount of the tax as determined by the Board, but the decision of the Board in effect denies to the taxpayer the more equitable rule provided by Congress for such transactions in the Act of 1918.

It is said that the Board has frequently applied the principle relied on here to other cases and counsel have cited a number of them. These and others thought to have some relation to the case have been examined but I have failed to note any other case in the Board's decisions dealing with a transaction like this one. In Ray v. Commissioner, and Brackett v. Commissioner, 19 B. T. A. 1154 [the Ray Case affirmed without opinion, and the Brackett Case on stipulation, by the Circuit Court of Appeals for the Seventh Circuit, 57 F.(2d) 1083, 1072], the contracts involved were, though related, clearly separate and independent and consecutive contracts of sale and reinvestment.

But as highly persuasive, if not controlling authority, defendant's counsel says that the action of the Board in this case has been affirmed in Moran v. Lucas, Commissioner, by the Court of Appeals of the District of Columbia, 59 App. D. C. 142, 36 F.(2d) 546. This is indeed highly persuasive authority which I should follow despite my individual opinion to the contrary if I could find from the opinion that the Court had really adjudicated the question as to whether the transaction here involved constituted a sale or an exchange. See Imbrovek v. Hamburg-American Steam Packet Co., opinion by Judge Rose (D. C. Md.) 190 F. 229, 233. But an examination of the opinion together with the prior history of this tax controversy indicates to me that the question of sale or exchange was really not in issue in that case and therefore cannot fairly be said to have been adjudicated. It will be remembered that the appeal to the Board taken by Saul, whose income tax is here in controversy, was heard by the Board before, although decided after, the effective date of the Act of 1926 (44 Stat. 9). In these circumstances there was no right on the part of the taxpayer to obtain a direct judicial review of the Board's ruling. And the suit for refund, after payment of the tax, was necessarily thereafter brought in this court under other provisions of the Acts of 1924 and 1926 (43 Stat. 253, 44 Stat. 9). The Moran Case, involving the same stock trans-

action, came before the Board a year or more after the decision in the Saul Case, and therefrom a direct judicial review of the Board's ruling was permissible under the Act of 1926. In the Saul Case the Commissioner had contended before the Board that the transaction should be treated as an exchange and not as a sale; but when the Board redetermined the tax in an amount largely in excess of what the Commissioner had determined it to be on the basis of an exchange, the Commissioner adopted the Board's action and assessed the higher deficiency. And when the Moran Case came on to be heard by the Board "the Commissioner amended his answer and admitted error in his original determination holding that the transaction was an exchange of stock for stock and alleged that it was a sale and that the profit derived by the taxpayer should be determined in accordance with the Board's decision in the Saul Case." Shea v. Commissioner, 11 B. T. A. 557, 558. Moran, the taxpayer, as did Saul in his case, contended that the transaction should be treated as a sale, but that the taxable proceeds of sale were limited to $400 a share for the Bank stock. There was thus no controversy before the Board between the parties that the transaction was a sale, and the same alignment evidently prevailed in the case on appeal from the Board; and no issue was presented to the Court of Appeals for decision as to whether the transaction was a sale or exchange of stock. Although the decision of the Board was affirmed, the opinion shows that the contest between the parties was wholly as to the amount of the tax on the assumption that it should be treated as a sale. Where this issue has been presented in cases somewhat parallel to the present case, the view that the transaction was an exchange rather than a sale has been adopted by other Circuit Courts of Appeals. See Howard v. Commissioner (C. C. A. 6) 56 F.(2d) 781, supra, and United States v. Siegel (C. C. A. 8) 52 F.(2d) 63.

For these reasons, I conclude that the proper income tax liability of the plaintiffs in these cases must be determined on the basis of the special provisions of the Act of 1918 regarding exchanges of stock in a merger and not on the basis of a sale. And it results that the proper amount of the tax was that originally determined by the Commissioner and not the smaller amount as claimed by the taxpayer, nor the larger amount as determined by the Board. As the third special count of the plaintiffs' declaration seeks to recover the whole amount of the tax paid over and above the amount reported by the taxpayer, the de-

fendant's demurrer to that count will be sustained.

But, as to the fourth special count of the declaration, the plaintiffs seek to recover only the amount of the tax paid over and above the amount as originally determined by the Commissioner. The views already expressed lead to the conclusion that for reasons of substantive law there was an over-payment of the tax to the extent claimed in the fourth count of the declaration. But apart from the substantive question as to the intrinsic proper amount of the tax, the plaintiffs also contend that the tax actually constituted an over-payment by reason of invalidity or irregularity of tax procedure resulting in its collection. The point here advanced is that the Board of Tax Appeals was without power in this case to increase the amount of the deficiency in the tax over and above that found by the Commissioner, and the subsequent action of the Commissioner in assessing the larger deficiency as re-determined by the Board, was also unauthorized and irregular.

The questions of income tax procedure thus presented seem to be novel and really unprecedented. They depend for their solution upon a detailed examination of those sections of the Revenue Laws of 1924 and 1926 respectively, dealing with the organization and powers of and procedure before the Board of Tax Appeals, and the powers and duties of the Commissioner of Internal Revenue in relation thereto. It will be remembered that in the case of these taxpayers their appeals to the Board from the Commissioner were filed and heard before the Board prior to the effective date of the 1926 Act although decided by the Board after the Act became effective. It is the contention of the plaintiffs that the powers of the Board in the re-determination of the tax and the powers of the Commissioner consequent thereon are governed in this case by the provisions of the 1926 Act and particularly by section 274 (e), 26 USCA § 1048c which provides as follows:

"The board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any penalty, additional amount or addition to the tax should be assessed, *if claim therefor is asserted by the commissioner at or before the hearing or a rehearing.*" (Italics supplied.)

It will also be remembered that in these cases before the Board the Commissioner did not at any time assert a claim for a greater deficiency than that originally determined by him. The plaintiffs say that therefore the Board was without power to increase the deficiency. And this is admitted by the defendant in this case if the section quoted is applicable. Moise v. Burnet (C. C. A.) 52 F. (2d) 1071. The plaintiffs further say that its applicability becomes clear upon reference to section 283 (b) and (a) of the Act, 26 US CA § 1064 (b) and (a). But the defendant replies that 283 (b) creates an exception by its reference to subdivision (j) of section 283, 26 USCA § 1064 (j), which is said to cover the particular case, and that the effect of subdivision (j) is to leave the procedure before the Board applicable to this particular case governed by the provisions of the Act of 1924 which contain no such express limitation on the Board's power as appears in section 274 (e) of the Act of 1926. A more detailed reference to these several sections would unduly prolong an already lengthy opinion; and I think it unnecessary to pursue the discussion further because in my opinion the same result follows whether the Act of 1924 or 1926 governs the particular case. Admittedly the Board did not have the power to increase the deficiency if the 1926 Act is applicable. Even if the defendant's contention, that the 1924 Act must control, is adopted the same result follows, because the 1924 Act does not expressly give the power to the Board to increase the deficiency as found by the Commissioner, and the courts would not be justified in expanding the powers of the Board by implication in view of the well established principle that taxing statutes are not to be expanded by implication beyond the clear import of the language used. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211. More importantly still, the Supreme Court has very fully reviewed and contrasted the provisions of the two Revenue Acts affecting the Board of Tax Appeals in Old Colony Trust Co. v. Commissioner, 279 U. S. 716, 49 S. Ct. 499, 501, 73 L. Ed. 918, where the Court said:

"The act of 1926 also enlarged the original jurisdiction of the Board of Tax Appeals to consider deficiencies beyond those shown in the Commissioner's notice, if the Commissioner made such a claim at or before the hearing (section 274 (e); 26 USCA § 1048c), and also to determine that the taxpayer not only did not owe the tax but had overpaid (section 234 (e); 26 USCA § 1065, note)."

It is the very clear inference from this language that the Supreme Court did not consider that the Board had the power under the Act of 1924.

The plaintiffs further contend that as the Board did not have authority in its re-determination of the tax to increase the deficiency over the amount originally found by the Commissioner, the latter had no authority to assess a tax in the amount re-determined by the Board in this case. While the assessment made by the Commissioner was made more than five years after the income tax return, it is not contended by the plaintiffs that the assessment was barred by limitations in time, waivers by the taxpayer having apparently intervened. But the plaintiffs do contend that under the limitations imposed on the Commissioner by section 274 of the Act of 1926 (26 USCA §§ 1048 to 1048f, 1050, 1052 to 1054), the assessment made by him in this case was irregular and invalid because his authority to make an assessment was limited to the extent of the deficiency determined by the Board, which necessarily implies a determination by the Board properly within its powers. Therefore, as the Board exceeded its power in the amount of deficiency determined by it, the assessment of the Commissioner based thereon was itself unauthorized. The result claimed is that the tax was collected by virtue of an illegal and unauthorized assessment and therefore constitutes an over-payment.

I think it unnecessary to discuss this particular subject further because it has its answer in the principle announced by the Supreme Court in Lewis v. Reynolds, 284 U. S. 281, 283, 52 S. Ct. 145, 146, 76 L. Ed. 293, where the court said (quoting language of the Court of Appeals [48 F.(2d) 515]) as follows:

"The above quoted provisions clearly limit refunds to overpayments. It follows that the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him."

See, also, United States v. Memphis Cotton Oil Co., 288 U. S. 62, 70, 53 S. Ct. 278, 77 L. Ed. 619. Lewis v. Reynolds was a case which involved a reaudit of an original return by the Commissioner, but the principle stated is one of broad application in suits to recover taxes paid to the Government and has been applied by Circuit Courts of Appeals to situations where taxes, although intrinsically due and owing, had been collected either without assessment or in consequence of invalid assessments or other irregular tax procedure. For illustration, see Champ Spring Co. v. United States (C. C. A.) 47 F.(2d) 1, certiorari denied 283 U. S. 852, 51 S. Ct. 560, 75 L. Ed. 1459; Crompton & Knowles Loom Works v. White (C. C. A. 1) 65 F.(2d) 132, 133; Hartwell Mills v. Rose (C. C. A. 5) 61 F.(2d) 441.

I conclude therefore that the plaintiffs in this case would not be entitled to recover by reason of the irregular tax procedure, if the tax actually paid was not more than the amount which might properly have been assessed. But as, for the reasons given, the proper amount of the tax was that originally found by the Commissioner and not that redetermined by the Board, the plaintiffs are entitled to recover to the extent of their overpayments as set out in the fourth special count of the declaration.

In reaching this conclusion I am not unmindful that the findings of the Board are to be treated as prima facie correct, but as the whole matter is obviously one of law and as I have reached a conclusion contrary to that found by the Board, the demurrer to the fourth count must be overruled. It is true that the fourth count as drawn by the pleader is based principally on the contention that the tax was over-paid by virtue of the irregularity of the tax procedure and does not expressly advance the contention that the transaction is taxable as an exchange. But nevertheless the facts disclosed in the declaration show in substance an over-payment of the tax which may, I think, under the broad doctrine of Lewis v. Reynolds, be recovered by the plaintiffs. The reasons for the recovery are largely conclusions of the pleader and may be properly disregarded. As a matter of pleading alone the matter is not of controlling importance because the fourth count, even if regarded as restricting the plaintiffs to a particular theory of recovery, could readily be amended or an additional count added, proceeding on the proper theory. Even the amendment is probably not necessary as the declaration contains two of the money counts customarily used in common law and Maryland pleading, including the count for money received by the defendant for the use of the plaintiffs, which of itself is broad enough un-

der the principle of Lewis v. Reynolds to permit the plaintiffs to recover if the tax has been over-paid.

The plaintiffs are, however, limited in their recovery by the scope of their petitions for refund fairly and liberally construed. The declaration sets out the petitions for refund which were filed on or about April 8, 1930. At the oral argument counsel for the defendant suggested that possibly the petition for refund was not broad enough to permit the plaintiff to recover in this case on the theory that the transaction constituted an exchange of stock rather than a sale, but also, without formally waiving any rights, expressed no desire to press the point. It is true that the reasons advanced for the refund requested do not expressly include a claim that the tax should have been computed on the basis of an exchange of stock under the 1918 Act, but the claim is broadly made for a refund of the whole amount of tax collected over and above that as reported by the taxpayer in his original return and separately claim is made for the additional amount required to be paid under the re-determination by order of the Board although here again, as in plaintiffs' declaration, the reason advanced is the irregular tax procedure. To the petition for refund as filed, the Commissioner replied (and the reply is also set out in the declaration) saying:

"You are advised that in view of the fact that your tax liability for the above named year was determined by the United States Board of Tax Appeals, this office is precluded from taking any further action in the case."

Construing the two papers together, it is apparent that the taxpayer would have gained nothing by the assignment of additional reasons for allowance of the refund, and, on the whole, bearing in mind that such petitions should be liberally rather than narrowly construed, in the interest of the taxpayer, and that objections thereto can be waived, I am of the opinion that the petition is broad enough to permit recovery in this case to the extent indicated. See Tucker v. Alexander, 275 U. S. 228, 48 S. Ct. 45, 72 L. Ed. 253; United States v. Memphis Cotton Oil Co., 288 U. S. 62, 53 S. Ct. 278, 77 L. Ed. 619; United States v. Henry Prentiss & Co., 288 U. S. 73, 53 S. Ct. 283, 77 L. Ed. 626; United States v. Factors & Finance Co., 288 U. S. 89, 53 S. Ct. 287, 77 L. Ed. 633; Warner v. Walsh (D. C. Conn.) 24 F.(2d) 449; Wunderle v. McCaughn (D. C. Pa.) 38 F.(2d) 258.