**WESTERN MARYLAND RAILWAY COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. Nos. 6631, 6704, 7549.**

United States District Court
D. Maryland, Civil Division.

May 18, 1955.

James C. Herndon, Akron, Ohio, Richard G. Herndon, Wheeling, W. Va., and William C. Purnell, Baltimore, Md., for plaintiff.

George Cochran Doub, U. S. Atty., and Robert R. Bair, Asst. U. S. Atty., Baltimore, Md., and Philip R. Miller, Sp. Asst. to the Atty. Gen., H. Brian Holland, Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to the Atty. Gen., for defendant.

THOMSEN, District Judge.

These three actions for refund of corporate excess profits taxes and interest

paid by plaintiff for the years 1943, 1944 and 1945, following assessment of additional taxes by the Commissioner of Internal Revenue, have been consolidated for trial. In arriving at profits subject to excess profits tax during those years, the law allowed certain alternative credits to taxpayers. I.R.C. of 1939, 26 U.S. C.A. § 710 et seq. Plaintiff elected to base its credit on stated percentages of its "invested capital", which included "equity invested capital" and "borrowed invested capital".

Plaintiff Western Maryland Railway Company (herein called plaintiff) was formed in 1917 as a result of the consolidation of a parent company with several wholly owned subsidiaries. The parent company was *The* Western Maryland Railway Company, a corporation organized in December, 1909, in connection with the reorganization of the Western Maryland Rail Road Company (herein called the Old Company). Since these cases involve the 1909–1910 reorganization, *The* Western Maryland Railway Company will be called the New Company.

In computing plaintiff's equity invested capital, the Commissioner of Internal Revenue allowed plaintiff the sum of $19,518,870.10 as invested capital paid in to the New Company for (a) 100,000 shares of preferred stock (par $100), which he found to have a fair market value of $70 per share ($7,000,000) at the time of issuance, January 1, 1910, and (b) 239,595.6 shares of common stock (par $100) which he found to have a market value of $52.25 per share ($12,-518,870.10). The basic issue in these cases is whether plaintiff is entitled to a larger allowance for "equity invested capital" as a result of the 1909–1910 transactions than the amount which the Commissioner allowed.

### Findings of Fact

The Old Company was chartered by a special act of the Maryland General Assembly in 1852, amended in 1853.

As of March 5, 1908, the Old Company had outstanding:

$48,718,000 First Mortgage and Divisional Bonds.

$2,233,950 Underlying or Leased Line Bonds and Guaranteed Stocks.

$10,000,000 General Lien and Convertible 4% Mortgage Bonds (herein referred to as General Lien Bonds), secured by the same properties as the First Mortgage Bonds but subject thereto.

$15,685,400 par value Common Stock (par $50)

It also owed substantial sums which were not funded.

On March 5, 1908, Bowling Green Trust Company of New York, as trustee under the mortgage securing the General Lien Bonds, filed suit in the United States Circuit Court for the District of Maryland. The bill recited that the Old Company would be unable to meet the semi-annual interest to become due April 1, 1908, in the amount of $749,620 on its First Mortgage Bonds and $200,000 on its General Lien Bonds, certain debts for materials and supplies then due in excess of $300,000, and certain notes totaling $3,776,750 which would become due April 1, 1908. The bill prayed for the appointment of a receiver for the Old Company and the foreclosure of the mortgage securing the General Lien Bonds.

The defendant consented to the appointment of a receiver and on the same day, March 5, 1908, the Court appointed Benjamin F. Bush, president of the Old Company, receiver of the properties covered by the General Lien mortgage.

Ancillary proceedings were filed in other districts where the Old Company owned property.

On March 10, 1908, an Agreement was entered into between a "Committee" and such holders of the General Lien Bonds as might become parties to the Agreement by depositing their bonds with the Equitable Trust Company of New York or the City Trust Company of Boston as depositaries thereunder. The Agreement provided that the Committee act as trustee, with legal title to all bonds deposited, and with full power and authority to take such steps as might be required to protect the depositing bond-

holders, including: the power to institute and become parties to legal proceedings; to cause the mortgage to be foreclosed; to purchase or join in purchasing at foreclosure or other sale the property covered by said mortgage and to apply towards payment therefor the General Lien Bonds and coupons deposited; to purchase any other property of the Old Company; to borrow money; to formulate a plan for the reorganization of the affairs of the Old Company for the benefit of the depositing bondholders; in its discretion, to recognize and make provision in the plan of reorganization for any or all of the creditors of the Old Company, secured and unsecured, and for the stockholders of the Old Company; and to organize such corporation or corporations as might be necessary to carry out the plan of reorganization.

On April 8, 1908, the Certificates of Deposit issued to depositors of General Lien Bonds pursuant to the Agreement were listed on the New York Stock Exchange. At the time of the application, March 31, 1908, $6,833,000 of the bonds had been deposited, and by January 1, 1910, $9,930,000 of the bonds had been deposited.

The Receiver issued a number of receiver's certificates, of which $4,492,846 were outstanding on July 1, 1909. On that date there were also outstanding $2,269,451.30 other obligations having priority over the General Lien Bonds, and $1,714,091 claims which the Committee called "disputed or forecloseable".

On July 26, 1909, the Committee submitted to the General Lien bondholders a Reorganization Plan, stating:

"It is proposed to effect the reorganization of the [Old] Company by the organization of a new company which shall take the property of the old company subject to its First Mortgage and its underlying and divisional bonds as specified in the foregoing [financial] statement.

"The new company will issue in acquisition of the property of the old company:

"$10,000,000 Four Per Cent. Non-Cumulative Preferred Stock (par value $100), preferred * * *, convertible * * *, redeemable * * *, and

"$23,959,560 Common Stock (par value $100) of an authorized issue of $50,000,000.

"The holders of certificates of deposit for General Lien and Convertible 4% Bonds will receive:

"(a) For principal, 100%, viz: $10,000,000, in new 4% preferred stock.

"(b) For unpaid overdue coupons * * * $836,000 (par value) in new common stock.

"The required $8,274,160 cash will be raised by sale of $20,685,400 of common stock to a Banker's Syndicate under the management of Blair & Co. who will offer the same as follows:

"(a) To the holders of certificates of deposit for $10,000,000 Western Maryland General Lien and Convertible Bonds 50% of their holdings, i. e.: $5,000,000 new stock, for 40% of its par value, or . . . . . . . $2,000,000

"(b) To the holders of $15,685,400 Western Maryland stock, in exchange for their old stock and on payment of 40% of the par value thereof in cash, 100% of their holdings, i. e.: $15,685,400 new common stock for . . . $6,274,160
$8,274,160"

In addition, the Plan contemplated that the New Company would issue $2,438,160 par value Common Stock "for expenses of reorganization, compensations, underwriting and other commissions and for reserve".

The Plan contemplated that of the $8,274,160 raised by the sale of the Common Stock at $40 per share, $6,762,297 would be used to pay obligations incurred by the Receiver between March, 1908, and July, 1909, for interest on the First Mortgage Bonds, for Equipment and Car

Trust Certificates and other secured obligations, and the remaining $1,511,863 would be used for "Improvements and for Current and Miscellaneous Requirements in Reorganization".

The Plan made no provision for the $1,714,091 of creditors' claims which it characterized as "disputed or forecloseable claims".

On the same day that the Plan was submitted to the General Lien bondholders, the Committee entered into an agreement with Blair & Co., as managers for a Bankers' Stock Purchase Syndicate, providing for the sale to the Syndicate, for $8,274,160 in cash, of $20,685,400 par value common stock of the proposed New Company "to be issued as and for the purposes contemplated in the Plan". The agreement also provided that the Syndicate should receive $827,416 par value common stock "as a commission or compensation to the Syndicate" and $200,000 par value common stock "as compensation to the Bankers individually for the services to be rendered by them hereunder", plus reimbursement for all other expenses of the individual bankers. The Syndicate agreed to offer the stock to the General Lien bondholders and to the stockholders of the Old Company, as provided in the Plan. The Syndicate members were not obligated to take or pay for any of the stock until the subscription and payment period to be offered to the stockholders and bondholders of the Old Company had expired.

On the same day, July 26, 1909, Blair & Co., the Syndicate managers, gave notice of the Plan to the holders of Certificates of Deposit for General Lien Bonds and to the common stockholders of the Old Company, and offered to sell to them pursuant to the Plan common stock in the proposed New Company, par value $100, at $40 per share, to be paid in four equal monthly instalments on the first days of September, October, November and December, 1909. An original September 1, 1909, deadline for acceptance was later extended to September 27, 1909.

On September 22, 1909, the deposit receipts issued to the stockholders of the Old Company and exchangeable for shares of stock in the proposed New Company, and warrants issued to holders of Certificates of Deposit for General Lien Bonds to purchase shares of common stock of the New Company were admitted to listing and trading on the New York Stock Exchange. By January 1, 1910, holders of 309,977 of the 313,708 outstanding shares of common stock (par $50) of the Old Company had deposited under the Plan. The evidence does not show the exact percentage of the bondholders and stockholders of the Old Company, and their assignees, who exercised their rights to subscribe for the common stock of the New Company, nor what percentage of such stock had to be taken and paid for by the Syndicate with its own funds; but I find that only a very small percentage had to be taken by the Syndicate.

On October 9, 1909, upon a report of John Hinkley, Special Master, the Circuit Court entered a Foreclosure Decree, which recited the obligations having priority over the General Lien Bonds, the default in payment of interest on such General Lien Bonds and the default declaration of July 12, 1909, found the properties of the Old Company indivisible, decreed payment of $10,894,022.23 principal and interest on the General Lien Bonds within five days, and upon default of such payment ordered that all the properties of the Old Company covered by the General Lien mortgage be sold, subject to specified superior liens. The decree further provided that " * * * all the right, title, estate, interest and equity of redemption of said defendant, Western Maryland Rail Road Company, and of all persons claiming or to claim under said defendant, excepting parties holding superior liens * * *, as well as all right, title, estate and interest of the Equitable Trust Company of New York, Trustee, complainant herein, of, in or to the said railroads, franchises, rolling-stock, bonds, stocks, property and premises, and every part and parcel thereof, shall be forever barred

and foreclosed". The Equitable Trust Company of New York had succeeded Bowling Green Trust Company as Trustee.

The decree provided that the sale be at public auction after advertisement, required each bidder to deposit $250,000 as security for his bid, and fixed an upset price of $6,500,000 below which bids would not be accepted. Payment of the bid price might be made in cash, or in cash and General Lien Bonds and coupons thereon. The decree required the Special Master to pay out of the proceeds of the sale, on each General Lien Bond presented to him for payment, "the amount applicable to the payment thereof", to cancel any such bonds and coupons that were paid in full, to properly stamp the bonds and coupons that were but partly paid, and to return them to the holders. The Special Master was authorized to accept temporarily as payment for the purchase price of the property the certificate of The Equitable Trust Company that it held General Lien Bonds and would deliver them to the Master for cancellation or other disposition.

As part of the purchase price, the decree required the purchaser to assume all indebtedness of the Old Company superior to the General Lien mortgage, including First Mortgage Bonds, Divisional Bonds and Leased Line Bonds and Guaranteed Stock and all unpaid compensation, expenses and obligations of the Receiver.

The decree then provided for the delivery to the purchaser of a deed entitling him "to have and to hold the said premises and property so purchased and conveyed, free and discharged from all the liens, claims and charges of the defendant, Western Maryland Rail Road Company, and of all persons claiming under it, except as in this decree expressly reserved".

The decree required the Old Company to join in the deed, which would "thereby convey and release to the purchaser or purchasers, and his or their successors and assigns, all its right, title and interest in and to the property conveyed by said Special Master"; required the Trustee under the General Lien mortgage to transfer and release to the purchaser or purchasers "all its right, title and interest under the said General Lien and Convertible Mortgage in and to the property so conveyed"; and required the Receiver to execute and deliver the deed for the property. The decree provided for a deficiency judgment in the event that the proceeds of sale were insufficient to pay the defaulted bonds and interest. In fact, however, no deficiency judgment was ever entered.

The decree was subsequently adopted and entered in the ancillary proceedings in other districts.

Pursuant to the decree, on November 19, 1909, the property was sold to Henry E. Cooper and Frank C. Nicodemus, Jr., the only bidders, for $6,500,000. Cooper was a member of the Committee. The purchasers made the required deposit of $250,000 in connection with their bid. The Special Master reported the sale, and on November 30, 1909, the court approved the Special Master's report and confirmed the sale.

On December 1, 1909, Cooper, Nicodemus and others incorporated the New Company, known as *The* Western Maryland Railway Company, "for the purpose of owning, possessing, maintaining and operating the lines of railroad and property (real and personal), rights, privileges and franchises formerly belonging to Western Maryland Railroad Company and sold to certain of the incorporators at" the foreclosure sale. The Company was authorized to issue preferred stock (par $100) having a total par value of $10,000,000, and common stock (par $100) having a total par value of $50,-000,000.

By its certificate of incorporation, the New Company expressly assumed the first mortgage on the property it would take over, but did not assume the General Lien Bonds or any other obligations of the Old Company.

On December 29, 1909, Cooper and Nicodemus, as purchasers, assigned to

the New Company all their right, title and interest under the Foreclosure Decree, in consideration of $1 and the assumption by the New Company of all the obligations required to be assumed by the purchasers under the Foreclosure Decree. Cooper and Nicodemus requested that delivery of all deeds to which they were entitled under the Foreclosure Decree be made to the New Company. On December 30, 1909, by joint deed of the Special Master, the Receiver, The Equitable Trust Company as Trustee of the General Lien Bonds, the Old Company, and Cooper and Nicodemus as purchasers, the properties of the Old Company were conveyed to the New Company. The conveyance was made subject to the First Mortgage lien and other liens superior to the General Lien mortgage, and subject to the condition that the New Company pay or assume the Receiver's obligations and the liens superior to the General Lien mortgage, as set forth in the Foreclosure Decree.

The Certificate of The Equitable Trust Company that it held General Lien Bonds of a total principal value of $9,930,000 was tendered and accepted as payment of the balance of the purchase price of the property. Sometime after December 15, 1909, the Special Master stamped each bond: "Paid on this bond with coupons maturing April 1, 1908, and subsequently, $650, out of the proceeds of the foreclosure sale made November 19, 1909, of the property mortgaged to secure the same. December 15, 1909. John Hinkley, Special Master." The coupons were stamped: "Paid in part, see bond. December 15, 1909. John Hinkley, Special Master". The Special Master then endorsed the certificate over to the New Company and directed the depository to hold the bonds subject to the order of the New Company. The Special Master reported this action to the Court on January 21, 1910, and also reported that, of the remaining $70,000 face value of the bonds not covered by the certificate of deposit, 19 bonds had been subsequently paid and that 51 bonds, totaling $51,000, were still outstanding as of January 21, 1910; that there was due the holders $650 for each of said bonds, or a total of $33,150; and that he was depositing with the Clerk of the Court the sum of $33,481.50 to be held for the payment of these bonds and a 1% commission to the Clerk. After deducting the $33,481.50 and the expenses and costs of sale from the $250,000 deposited by Cooper and Nicodemus, there was a balance of $204,168.50 which the Special Master turned over to the New Company, under order of the Circuit Court.

As of January 1, 1910, the New Company opened its books and issued its preferred and common stock in accordance with the Plan and various agreements made pursuant thereto. A search of court records by counsel for plaintiff indicates that apparently no stock issuance statement was issued under Art. 23, §§ 35 and 36 of the Maryland Code [1], since the only statement found relates to the later sale of common stock in April, 1910. The original minute book

---

1. Art. 23, Maryland Code of Public General Laws, §§ 35 and 36, as enacted by Ch. 240 of the Acts of 1908, p. 38:

"Sec. 35. Any corporation of this State may issue stock, preferred or common, for services or for property of any description; provided (1) that such services are rendered to or adopted by said corporation; (2) that the property is suitable for any of the purposes for which the corporation was formed; (3) that the value of such services and property, and the propriety of issuing stock therefor, shall be agreed upon and the issue authorized by the affirmative vote of a majority of all the stock (or if two or more classes of stock have been issued, of a majority of each class) outstanding and entitled to vote, given at any meeting duly warned as provided for by Sections 15 or 16 of this Article, and (4) that in counting the majority of the outstanding stock necessary to authorize the issuance of stock for services or property under this section, no stock shall be counted whose owner or holder is interested in such services or property, nor any stock that has merely been subscribed for, and payment for which is to be made in services.

"Sec. 36. Whenever the stock of any corporation is issued for services or property, in accordance with the preceding section, the books of the corporation shall be so kept as to show at all times fully what property was received and what services were rendered for the said stock;

and many other records of the New Company were destroyed in a fire years ago. Plaintiff was, therefore, unable to show the terms of the resolution authorizing the issuance of the stock. It was also unable to produce any evidence with respect to the disposition of certain assets and certain liabilities of the Old Company. Nor was it able to produce any satisfactory evidence showing the disposition of the cash paid to Equitable Trust Company by subscribers to the common stock of the New Company. What was done in many instances must be arrived at by inference or guesswork.

The matter is further complicated by the fact that no separate set of books had been opened for the Receiver of the Old Company; the books of the Old Company had been kept open and many, but by no means all, transactions of the Receiver were entered in them. Presumably some records were kept by the Committee, but many of its essential records have been destroyed or are unavailable.

When the books of the Old Company and the Receiver were closed on January 1, 1910, certain accounts which had appeared in the Plan of Reorganization under the headings "Receiver's Obligations", "Lien Notes on Coal Lands" and "Other Items", in the total amount of $6,762,297.30 as of July 1, 1909, still remained open. The Receiver's Obligations had increased from $4,492,846 on July 1, 1909, to $4,657,850 on December 31, 1909. The Lien Notes on Coal Lands remained at $1,854,639.87. It is impossible to trace the "Other Items" which were reported as $414,811.43 as of July 1, 1909.

The parties have stipulated that part of the sum of $8,274,160 received in cash by the Committee was used by the Committee to pay and discharge, on behalf of the New Company, the Receiver's obligations and other obligations having priority over the lien of the General Lien mortgage. It is impossible to tell how much cash was needed to discharge these and other obligations which were unpaid on December 31, 1909, but it has been stipulated by the parties that, to the extent not used for that purpose or other purposes provided for in the Plan, the $8,274,160 cash was accounted for by the Committee to the New Company.

There is nothing on the books of the New Company to indicate that the $8,274,160 cash, or any substantial part thereof, was ever paid over to the New Company. The account in the general ledger headed "General Lien and Convertible Mortgage Bondholders' Committee" contained no detailed accounting with respect to the cash received and disbursed by the Committee for the account of the New Company.

Most of the Receiver's obligations, which totalled $4,492,846 on July 1, 1909,

at what value, and the number of shares issued for the same. Whenever any stock is issued in payment for services or property, as aforesaid, a certificate, signed by the president or vice-president and secretary and sworn to by the treasurer, setting forth the amount of stock so issued and the property or services in payment for which said stock is issued, and particularly specifying the nature and character of such property or services, shall, within thirty days after the issue of said stock, be filed in the office of the clerk of the Circuit Court for the county in which the principal office of the corporation is located (or of the clerk of the Superior Court of Baltimore City, if such principal office is located in Baltimore City), and any officer or director of such corporation wilfully and knowingly authorizing or consenting to the failure to so file such

a certificate within thirty days from the issue of said stock, or wilfully and knowingly making or consenting to any false statement contained in the entries required by this section to be made on the books of the corporation, or of said certificate, shall be deemed guilty of a misdemeanor, and upon conviction, shall be subject to the pains and penalties prescribed by Section 134 of Article 27 of the said Code of 1904. Provided, however, that the valuation placed by the stockholders upon such services or property at the meeting duly warned, as aforesaid, and the propriety of their action in accepting the same and issuing the agreed number of shares therefor, shall in the absence of actual fraud be conclusive against and binding upon any and all creditors of the corporation."

and $4,657,850 on December 31, 1909, did not mature until various dates between 1911 and 1919, inclusive. There is no record to show how these items were paid, but presumably the necessary money was held by the Equitable Trust Company of New York as agent for the Committee and the New Company and disbursed by the Trust Company.

It is impossible to tell from the books offered in evidence what happened to the $1,810,123.25 claims of general unsecured creditors allowed by the Special Master and not paid by the Receiver. I find that some or all of them were purchased by the New Company at a very small cost, probably about $20,000.

The balances on the books of the Old Company and its Receiver as of December 31, 1909, were closed by journal entries into a clearing account entitled "Cost of Property".

Plaintiff has attempted, in various exhibits and in its briefs, to reconcile the closing entries on the books of the Old Company and its Receiver with the opening entries on the books of the New Company. I find as a fact that the attempted reconciliation is practically valueless because plaintiff has had to make, and has made, many assumptions which are not supported by evidence and which I find as a fact are not reasonable inferences from the testimony and exhibits.

The books of the New Company were opened as of January 1, 1910. The first entry in its General Journal read as follows:

"Sundries                                    (Dr.)        (Cr.)

"To Sundries

"For railroads and other property, stocks of subsidiary lines, stock and bonds of other companies, also assets and cash received and receivable under Reorganization Plan, less receivership obligations, liabilities and other charges subject to which the properties were acquired, as follows:

"Sundries

"To Cost of Property                                    15,921,720.02

"For balances standing to debit of the following accounts on the books of the Western Maryland Railroad Company at December 31, 1909, transferred to the books of this Company, as of January 1, 1910."

Then followed a long list of debits to various accounts, totalling $15,921,720.-02.

The obligation on the books of the Old Company for the payment of the balance due on the General Lien Bonds, which had never been properly posted on those books to reflect the accrual of interest, the foreclosure proceedings and other relevant items, was not carried onto the books of the New Company as a liability in any amount.

The journal entries on the books of the Old Company reflect the accrual of interest on the First Mortgage, which was assumed by the New Company, but they fail to reflect any accrual of interest with respect to the General Lien Bonds.

The issuance of preferred and common stock of the New Company was shown by the following entry in its General Journal:

| | (Folio) | (Dr.) | (Cr.) |
|---|---|---|---|
| "Cost of Property | 1 | 33,959,560.00 | |
| "To Capital Stock—Common | 300 | | 23,909,560.00 |

"For amount of common stock of The Western Maryland Railway Company issued in accordance with the Plan of Reorganization, dated July 26, 1909, and pursuant to the purchase of railroad properties sold under foreclosure proceedings November 19th, 1909.

$23,959,560.00

"Less 50 shares of the par value of $100 each, subscribed for by five in corporators.　　　50,000.00

"To Western Maryland Railroad Company General Lien & Convertible Mortgage Bondholders Committee

| | 864 | | 50,000.00 |

For this amount advanced for purposes of incorporation of The Western Maryland Railway Company

To Preferred Stock 4%, Non-Cumulative

| | 301 | | 10,000,000.00 |

For amount of Non-cumulative 4% preferred stock issued to holders of certificates of deposit for $10,000,000.00 Western Maryland Railroad General Lien & Convertible Mortgage Bonds as provided in Plan of Reorganization."

I find as a fact, in the light of all the testimony and exhibits in the case, that these entries do not show that the New Company ever assumed any obligation of any sort for the payment of the General Lien Bonds or any balance due thereon. I further find that these entries were an effort on the part of the bookkeeper to state in accounting terms the facts in connection with the issuance of the preferred and common stock of the New Company, "in accordance with the Plan of Reorganization" and "as provided in the Plan of Reorganization", and that the legal effect of what was done must be gathered from the Plan and what was actually done pursuant thereto.

The general ledger of the New Company contains a separate ledger account for each issue of underlying bonds assumed, but contains no ledger account dealing with the General Lien Bonds.

The first balance sheet of the New Company, as of January 1, 1910, published in its application for listing its preferred and common stock on the New York Stock Exchange, does not show any liability with respect to the General Lien Bonds and does not reflect any contributions to capital or any accumulated earnings or profits.

In that application, the New Company made the following statement:

"In consideration for the railroads and property acquired by the new Company, as well as the amount in money payable to it or for its account under the terms of the Reorganization Plan, the new Company agreed to issue $10,000,000 par value, of Preferred Stock, and $23,-959,560, par value, of Common Stock, which amounts of stock have been issued and are fully paid and non-assessable.

"Of the $15,685,400, par value, of stock of Western Maryland Rail Road Company, $15,498,850, par value, being over Ninety-eight per cent., was deposited under the Plan. Of the $10,000,000, par value, of General Lien and Convertible Mortgage Bonds of Western Maryland Railroad Company, $9,930,000 par value of such bonds, being over Ninety-nine per cent., were deposited under the Plan.

"The basis of participation of General Lien and Convertible Mortgage Bonds and Stock of the old Company under the Plan was as follows:

"General Lien and Convertible Mortgage Bonds, $10,000,000 received $10,000,000 in Preferred Stock, and upon payment therefor at Forty per cent. of its par value in cash, $5,000,000 of Common Stock; also $836,000 par value in Common Stock for unpaid and overdue coupons.

"$15,685,400 par value old stock received in exchange, and on payment of Forty per cent. of the par value thereof in cash, $15,685,400 of Common Stock."

On May 29, 1911, the New Company filed a petition in the Circuit Court alleging that the Old Company still held property valued at $151,333.57 not covered by the foreclosed mortgage; that there were $1,810,123.25 in claims of creditors allowed by the Special Master still unpaid; that there were also unfiled and unpaid claims and judgments against the Old Company totaling $45,604.61; that there were claims of bondholders holding bonds of face value of $70,000 who had failed to deposit under the Plan and who had been paid only $650 each, or a total of $45,500; and that these claims and the claims of the remaining General Lien bondholders constituted all the claims to which the residuary property was subject. The New Company asserted that it had become the owner of these claims (which it evidently had purchased as cheaply as possible, probably for about $20,000), with the exception of the $70,000 bonds, and hence was the substantial equitable owner of the property. On the same day the Court entered an order granting the holders of the 70 bonds the option of receiving preferred stock and common stock, as set forth in the Reorganization Plan, or in the alternative $20 in cash for each $1,000 bond. The order then transferred all of the remaining railroad property to the New Company. By December, 1912, holders of 69 of the 70 bonds had surrendered them for preferred and common stock of the New Company.

The plaintiff, Western Maryland Railway Company, is a railroad corporation formed in 1917 as a result of a consolidation of its predecessor company, *The* Western Maryland Railway Company (which has been referred to herein as the New Company) with seven wholly owned subsidiaries. The parties are agreed that plaintiff is entitled to include

in its invested capital the invested capital of its predecessor, *The* Western Maryland Railway Company, which was paid in 1910 upon the issuance of stock by the latter (the New) Company.

In the computation of plaintiff's invested capital, the Commissioner of Internal Revenue allowed $19,518,870.10 as having been paid in upon the issuance of the perferred and common stock of the New Company (*The* Western Maryland Railway Company). See also Findings of Fact, under the heading "What the Commissioner Determined", below.

In making that allowance, the Commissioner allowed the market value of the stock on January 1, 1910, which he determined to be in the case of the preferred stock $70 per share, and in the case of the common stock $52.25 per share. Findings of fact with respect to the sales and quotations on the New York Stock Exchange during the years 1909 and 1910 of various stocks, bonds, deposit receipts, purchase warrants, etc., will be included in the discussion of the various points below.

Plaintiff had claimed invested capital credit for the years 1943, 1944 and 1945 based upon amounts in excess of the Commissioner's allowances, and accordingly was compelled to pay deficiency assessments of excess profits taxes for those years. Plaintiff subsequently claimed that it was entitled to carry back an unused excess profits credit from 1946

to 1944 and to carry over an unused excess profits credit from 1941 to 1943.

The Commissioner of Internal Revenue denied plaintiff's claims for refund. Upon denial of the claims, the plaintiff brought these actions, which have been consolidated for trial.

The parties have agreed that they will compute the tax effect of the court's determinations after the court enters its findings on the disputed issues.

■ The Government offered evidence that in March, 1910, the New Company, for the purpose of constructing a new railroad line, authorized the issuance of $25,469,670 par value additional common stock, and offered this stock to its preferred and common stockholders to the extent of 70% of their holdings at $50 per share, a price determined by its Board of Directors to be the fair market price as of the time of authorization. I find that this evidence has no substantial bearing on any issue in the case, and grant plaintiff's motion to strike it from the record. Other evidence rulings are indicated in the discussion of the various points.

### The Statute and Regulations

Under the World War II Excess Profits Tax Law, Title 26 U.S.C.A. § 710 et seq.[2], net income subject to excess profits taxes was determined by making certain adjustments to normal-tax net income, reducing it by an "excess profits credit" and by any unused excess profits credit

2. Internal Revenue Code of 1939, 26 U.S. C., 1952 Ed.:

"§ 710 [As added by Section 201, Second Revenue Act of 1940, c. 757, 54 Stat. 954]. Imposition of tax
\* \* \* \* \* \* \*

"(b) Definition of adjusted excess profits net income. As used in this section, the term 'adjusted excess profits net income' in the case of any taxable year means the excess profits net income (as defined in section 711) minus the sum of:
\* \* \* \* \* \* \*

"(2) Excess profits credit. The amount of the excess profits credit allowed under section 712; and
\* \* \* \* \* \*

"§ 712 [As added by Section 201, Second Revenue Act of 1940]. Excess profits credit—Allowance

"(a) [As amended by Section 13, Excess Profits Tax Amendments of 1941, c. 10, 55 Stat. 17.] Domestic corporations. In the case of a domestic corporation which was in existence before January 1, 1940, the excess profits credit for any taxable year shall be an amount computed under section 713 or section 714, whichever amount results in the lesser tax under this subchapter for the taxable year for which the tax under this subchapter is being computed. \* \* \*
\* \* \* \* \* \* \*

"§ 714 [As added by Section 201, Second Revenue Act of 1940; as amended by Section 201(b), Revenue Act of 1941, c. 412, 55 Stat. 687]. Excess profits credit —based on invested capital

carry-over from past years or carry-back from subsequent years. Sections 710, 711, 712. The "excess profits credit" (and any unused portion to be carried over or carried back) was determined by applying prescribed percentages to either the average net income during a defined base period, section 713, or to "invested capital", section 714, whichever method produced the lower tax. Under the invested capital method which is the method applicable to the computation of plaintiff's credit in these cases, the prescribed percentages ranged from 8% of invested capital of $5,000,000 or under, to 5% of invested capital in excess of $10,000,000.

"Invested capital" was the sum of "equity invested capital", as defined in section 718, and "borrowed invested capital" (as defined in section 719). The present proceedings are concerned only with the determination of the "equity invested capital" portion of "invested capital".

Section 718(a) provided that "equity invested capital" should include;

"The excess profits credit, for any taxable year, computed under this section, shall be the amount shown in the following table:

If the invested capital for the taxable year, determined under section 715 is:

The credit shall be:

"Not over $5,000,000 ...............  8% of the invested capital.

"Over $5,000,000, but not over $10,000,000.  $400,000, plus 6% of the excess over $5,000,000.

"Over $10,000,000 ....................  $700,000, plus 5% of the excess over $10,000,000.

\* \* \* \* \* \* \*

"§ 717 [As added by Section 201, Second Revenue Act of 1940]. Daily invested capital

"The daily invested capital for any day of the taxable year shall be the sum of the equity invested capital for such day plus the borrowed invested capital for such day determined under section 719.

"§ 718 [As added by Section 201, Second Revenue Act of 1940]. Equity invested capital

"(a) Definition. The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)— .

"(1) Money paid in. Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) Property paid in. Property (other than money) previously paid in (re-

(1) money paid in for stock, or as paid in surplus, or as a contribution to capital;

(2) property (other than money) paid in for stock, such property to be included in an amount equal to its basis (unadjusted) for determining loss on a sale or exchange—i. e., cost to the acquiring corporation (section 113(a)) [3]. Reg. 112, sec. 35.718–1 [4], provided that "If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance";

(3) certain distributions in stock; and

(4) the accumulated earnings and profits as of the beginning of the taxable year.

What the Commissioner Determined

A stipulation of facts entered into between plaintiff and the Government included the following paragraph:

"37. In the computation of the Plaintiff's invested capital, the Commissioner of Internal Revenue al-

gardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. \* \* \*

\* \* \* \* \* \* \*

"(4) Earnings and profits at beginning of year. The accumulated earnings and profits as of the beginning of such taxable year; \* \* \*."

3. Internal Revenue Code of 1939, 26 U.S. C., 1952 Ed.:

"§ 113. Adjusted basis for determining gain or loss—

"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—\* \* \*."

4. Treasury Regulations 112, promulgated under the Internal Revenue Code of 1939:

"Sec. 35.718–1 Determination of Daily Equity Invested Capital—Money and

lowed the following sums as having been paid in upon the issuance of the preferred and common stock of The Western Maryland Railway Company as a result of transactions referred to in Paragraph 25, supra:

"Invested capital paid in for 100,000 shares of $100 par value preferred stock ................ $7,000,000.00

"Invested capital paid in for 239,595.6 shares of $100 par value common stock 12,518,870.10

"TOTAL        $19,518,870.10

"In making the foregoing allowances, the Commissioner determined the fair market value of the stock at January 1, 1910, to be, in the case of the Preferred stock, $70 per share, and in the case of the Common stock, $52.25 per share."

This stipulation was based upon a letter which the Internal Revenue Agent in Charge sent to plaintiff on February 12, 1951, notifying plaintiff of "a recomputation of the corporation's income tax liability for the years involved which is the result of the Bureau's decision". Attached to the letter as an appendix was the following exhibit:

"Western Maryland Railway Company Years Ended: 12/31/42, 43, 44 & 45

Exhibit "A"

Computation of Adjustment to Invested Capital in Connection
with the 1909–1910 Reorganization

New Preferred & Common Stock is included as follows:

100,000 shares new 4% Preferred issued for $10,000,000.00 defaulted General Lien & Convertible bonds 100,000 at $70.00 ..................... $ 7,000,000.00

New $100 par Common:
In exchange for old Common Stock 156,854 at $52.25 per share ............. $ 8,195,621.50
To General lien & Convertible Bondholders on payment of $40.00 per share 50,000 at $52.25 per share ........ $ 2,612,500.00
To General line (sic) & Convertible Bondholders for overdue interest 8,360 at 52.25 per share ............... $ 436,810.00
To reorganization Committee for Commissions and expenses 24,381.6 at $52.25 .............. $ 1,273,938.60

TOTAL ..................... $19,518,870.10

Included per Supplemental Field Conference report dated 11–7–50 ............. $23,534,860.00

Adjustment ............ $4,015,989.90"

Property Paid In.—The equity invested capital for any day is determined as of the beginning of such day. The basis or starting point is found in the amount of money and property previously paid in for stock, or as paid-in surplus, or as a contribution to capital. * * *

"If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance. If the stock had no established market value at the time of the exchange, the fair market value of the assets of the company at that time should be determined and the liabilities deducted. The resulting net worth will be deemed to represent the total value of the outstanding stock. In determining net worth for the purpose of fixing the fair market value of the stock at the time of the exchange, the property paid in for such stock shall be included in the assets at its fair market value at that time. * * * *"

In their oral arguments and their briefs, the parties disagreed as to the significance of this exhibit, and what the Commissioner actually determined. These contentions will be discussed below.

■ I find that the stipulation quoted above properly interpreted the findings of the Commissioner and Exhibit A; that the Commissioner treated the Reorganization Plan, the incorporation of the New Company, and the issuance of its preferred and common stock pursuant thereto, as a "package deal"; that he considered the preferred and common stock of the New Company to have been issued for property, cash, and the services involved in making up the "package"; and that in Exhibit A the common stock was broken down into four categories to correspond to the four categories shown on page 5 of the "Reorganization Plan", which was filed in this case as plaintiff's Exhibit No. 3.

### Plaintiff's Position

Plaintiff contends that by Exhibit A, quoted above, the Commissioner made five separate and specific decisions and allowances; that plaintiff can accept such of those decisions or such parts of those decisions as are favorable to it, and can claim additional allowances on other theories, even though those other theories may be inconsistent with the allowance of one or more of the items so "accepted" by plaintiff.

A. Plaintiff contends that the Commissioner decided that the preferred stock of the New Company was issued for the General Lien Bonds of the Old Company, rather than for its property. Plaintiff further contends: (1) that the valuation of the preferred stock should have been $73.50 per share rather than $70 per share; and (2) that the Commissioner should have permitted plaintiff to include in its equity invested capital the difference between $10,000,000 (the face value of the General Lien Bonds of the Old Company) and the fair market value of the preferred stock of the New Company (whether

$7,000,000 or $7,350,000) as an addition to the accumulated earnings and profits of the New Company.

B. Plaintiff contends that the Commissioner determined that 156,854 shares of common stock of the New Company, valued at $52.25 each, were issued in exchange for the common stock of the Old Company, and not for $40 per share, nor for the old common stock plus $40 per share; and that in computing its equity invested capital plaintiff should be allowed (1) $52.25 per share, or $8,195,621.50, as the fair market value of the 156,854 shares of the common stock of the New Company, so issued, plus (2) $40 per share, or $6,274,160, the amount actually paid therefor, which plaintiff claims was a contribution to capital or an assessment on the common stock of the Old Company.

Plaintiff "accepts" the allowance of $52.25 per share for the 50,000 shares of common stock of the New Company sold at $40 per share to the depositing General Lien bondholders by the syndicate, although such an allowance is inconsistent with plaintiff's theory that the $40 per share paid to the New Company for its common stock was a contribution to capital or an assessment. Such an allowance ($52.25 per share) is only justified if the transaction be treated as a whole, and the preferred and common stock of the New Company be considered as having been issued for property, cash, commissions and expenses as a single package.

Plaintiff also "accepts" the allowance of $52.25 per share for the 8,360 shares of common stock of the New Company issued for overdue interest on the old bonds, and for the 24,381.6 shares issued for commissions and expenses, although if the transaction is broken down as plaintiff suggests, the statute would not authorize any allowances for stock issued to the syndicate managers for services rendered, or for their commissions and expenses.

### The Government's Position

The Government contends that plaintiff is entitled to include in equity in-

vested capital no more than (1) the cost of the railroad properties acquired by the New Company in the 1909–1910 reorganization and (2) the sum of money paid in in connection with that reorganization;

(1) that the cost of the railroad properties acquired by the New Company is measured by the fair market value of stock issued for such properties; that the stock issued for the properties consisted of 100,000 shares of preferred stock valued at $70 per share, or $7,000,000, and 8,360 shares of common stock valued at $52.25 per share, or $436,810, so that the cost to the New Company of the railroad properties (subject to prior liens) totaled $7,436,810;

(2) that money paid in consisted of $8,274,160 paid in for the new common stock, whether deemed sold to the Syndicate headed by Blair & Co. or to the former security holders of the Old Company; and that plaintiff is entitled, therefore, to total equity invested capital of $15,710,970 in connection with the 1909–1910 reorganization.

The Commissioner allowed the plaintiff $19,518,870.10. So, the Government contends, plaintiff has failed to establish that it is entitled to a larger allowance for equity invested capital than the amount allowed by the Commissioner, and the complaints should be dismissed.

### Legal Effect of Exhibit 52

Exhibit 52 was the letter in which the Internal Revenue Agent in Charge notified plaintiff of the "recomputation of the corporation's income tax liability for the years involved which is the result of the Bureau's decision".

Plaintiff contends that each item in Exhibit A attached to that letter is a separate determination, which the Government cannot challenge in this case. But plaintiff contends that plaintiff is free to pick and choose among the findings, accept those in its favor, and claim additional allowances under theories inconsistent with the theory on which the accepted items were based.

I have found that the Commissioner treated the Plan of Reorganization as a whole, and allowed as equity invested capital under section 718(a) the fair market value of the preferred stock and the common stock of the New Company issued for property, cash, commissions and expenses, pursuant to the Plan. The common stock was broken down into four categories, to correspond with the four categories shown on page 5 of the Reorganization Plan.

However, even if the separate items on Exhibit A be treated as separate determinations, it does not follow that the findings of the Commissioner are binding on the Government and cannot be put in issue in this suit. Plaintiff's contention misconstrues the nature of this action and the burden on plaintiff. The ultimate question in an action for refund of taxes is not whether the Commissioner erred, but whether the taxpayer can establish that his taxes for the year in question have been overpaid; in other words, whether the Government has money which is rightfully his.

Whatever may have been the determinations of the Commissioner, they cannot change the true facts or preclude the court from drawing proper inferences from those facts. What was paid in for the new common and preferred stock in connection with the 1909–1910 reorganization is a question to be determined by this court in this suit. An action for refund of taxes paid is in the nature of an action for money had and received, and is governed by equitable principles. Stone v. White, 1937, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265; Lewis v. Reynolds, 1932, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293; Reinecke v. Spalding, 1930, 280 U.S. 227, 233, 50 S.Ct. 96, 74 L.Ed. 385. In such an action, the plaintiff must recover by virtue of a right measured by equitable standards, and if under all the facts the taxpayer has failed to show that the government has an excess of taxes for the year in question which equitably belongs to

the taxpayer, he cannot recover. Ryan v. Alexander, 10 Cir., 118 F.2d 744.

■ It is true, as contended by plaintiff, that "the taxpayer is entitled to know the basis of law and facts on which the Commissioner asserts deficiencies and until this is done, there is no burden of proof resting on the taxpayer." Cornett-Lewis Coal Co. v. Commissioner, 6 Cir., 141 F.2d 1000, 1005. But in many suits for refund, the courts have held that a taxpayer may not capitalize upon a mistaken determination of the Commissioner where the evidence fails to show that the taxpayer has overpaid his taxes. It is not necessary that the Commissioner make an official redetermination before the suit for refund is filed, provided the taxpayer is not taken by surprise and the Government has informed him of its position. In the instant case the Government informed plaintiff of its contentions well before trial. United States v. Pfister, 8 Cir., 205 F.2d 538; Alexander Sprunt & Son, Inc., v. Commissioner, 4 Cir., 64 F.2d 424; Tait v. Safe Deposit & Trust Co., 4 Cir., 70 F.2d 79; American Security & Trust Co. v. Tait, D.C.D.Md., 5 F.Supp. 337; Lewis v. Reynolds, 1932, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293; Pacific Mills v. Nichols, D.C.D.Mass., 31 F.Supp. 43; Routzahn v. Brown, 6 Cir., 95 F.2d 766; Hartford Nat. Bank & Trust Co. v. Smith, D.C.D.Conn., 54 F.Supp. 579.

### The Fair Market Value of the Preferred Stock at the Time of its Issuance

Regulation 112, sec. 35.718(1) provides:

"If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance. If the stock had no established market value at the time of the exchange, the fair market value of the assets of the company at that time should be determined and the liabilities deducted. The resulting net worth will be deemed to represent the total value of the outstanding stock. In determining net worth for the purpose of fixing the fair market value of the stock at the time of the exchange, the property paid in for such stock shall be included in the assets at its fair market value at that time."

The Commissioner fixed the value of $70 per share as the value of the preferred stock at the time of its issuance. The Commissioner did not state what date he had determined to be the date of issuance but referred to the stock as having been issued "in connection with the 1909–1910 reorganization". The parties have stipulated that the Commissioner valued the stock at January 1, 1910.

The stock was issued as of January 1, 1910. There is no evidence to show when the certificates were actually issued, since all of the relevant records were destroyed by fire or are otherwise unavailable. I find that the "time of issuance" within the meaning of the regulation was January 1, 1910.

■ The burden was upon plaintiff to prove that the valuation by the Commissioner was erroneous. Fox River Paper Corp. v. U. S., 7 Cir., 165 F.2d 639. "The primary evidence of the fair market value of the corporate stock is what willing purchasers pay to willing sellers on the open market, even though the assets of the corporation do not reflect such values." Hazeltine Corp. v. C.I.R., 3 Cir., 89 F.2d 513, at page 519. See also Commissioner v. Robertson, 6 Cir., 75 F.2d 540, certiorari denied 295 U.S. 763, 55 S.Ct. 922, 79 L.Ed. 1705. But the transaction must be viewed as a whole. Hazeltine Corp. v. C.I.R., supra, and cases cited therein. " * * * the statute and the regulation contemplate the exercise of fair and reasonable judgment by the court in finding from all the facts and circumstances of the case, what the fair market value of the stock was at the date of exchange." Tennessee Products Corp. v. U. S., 107 F.Supp. 578, at page 587, 124 Ct.Cl. 1; Penney & Long

v. Commissioner, 4 Cir., 39 F.2d 849; Fox River Paper Corp. v. U. S., supra. Expert testimony may be considered. Helvering v. Safe Deposit & Trust Co. of Baltimore, 4 Cir., 95 F.2d 806, 812.

The preferred stock was not listed until March, 1910. Its only sales during that month were at $70 per share. In April, 1910, it sold at a high of 70 and a low of 68½. During the next five months, it sold as high as 71 and as low as 67. Estate tax cases have held that gains or losses after the deceased's death cannot be considered in determining the value of stock at the date of death. Camp v. U. S., 4 Cir., 44 F.2d 126, 128; Helvering v. Safe Deposit & Trust Co., 4 Cir., 95 F.2d 806, 811. The evidence of sales in April should, therefore, be given little, if any, weight.

The Certificates of Deposit issued to holders of General Lien Bonds who deposited them with the Committee's agent were actively traded on the New York Stock Exchange. In December, 1909, after the refunding plan had been put into effect, the property sold to the representatives of the committee, and the new corporation organized, those certificates entitled the holders to receive $100 par value of preferred stock of the New Company for each $100 face value of General Lien Bonds which had been deposited. If the holder of the certificate had exercised the option to purchase common stock in the New Company at $40 per share, he also had a warrant to receive such stock, which was being actively traded, as were similar warrants issued to the common stockholders of the Old Company. If the General Lien bondholders had not deposited their bonds, as a few had not, those bonds could be sold on the New York Stock Exchange, and a few bonds were sold. Those nondepositing bondholders were given the right to deposit and accept the plan after January 1, 1910. Therefore, the value of the undeposited bonds may have included some value for the warrant to buy the common stock; but the bonds and certificates usually sold at approximately the same price.

During the week ending December 3, 1909, $45,000 of certificates sold at a low of 67 and a high of 68. During the week ending December 10, $46,000 of certificates sold for 67½ to 68. During the week ending December 17, $549,000 of certificates sold between 68 and 74, and one bond sold at 70. During the week ending December 24, $58,000 of certificates sold for 72¾ to 73. During the week ending December 31, $71,000 of certificates sold between 72¾ and 73¼. No certificates were sold during the week ending January 7, 1910, but $2,000 of bonds were sold at 73. During the week ending January 14, 1910, $28,000 of certificates sold between 68½ and 69½ and $10,000 of bonds sold for 73. During the week of January 21, $13,000 of certificates sold between 71 and 72. During the week ending February 28, $77,000 of certificates sold between 70¼ and 71⅞.

The Government offered the testimony of a stockbroker, Thomas G. Campbell, who testified that if the taxpayer had had to sell the $10,000,000 issue of preferred stock in the New Company in January, 1910, on the market, it could not have realized more than $6,500,000, taking into account the price at which the public would absorb such a large issue and the profit which the underwriters would demand. Under Helvering v. Safe Deposit & Trust Co. of Baltimore, supra, this evidence was admissible. However, this is a different kind of case. In an estate tax case, the practical problem is frequently the price at which the assets could be sold. In this case, the regulation states that the value to be used shall be the fair market value at the time of issuance. I therefore feel that although it is admissible, little if any weight should be given to the testimony of the witness Campbell in this case.

Looking at the case as a whole, as I am required to do under the authorities quoted above, and considering primarily the prices at which the certificates sold on the New York Stock Exchange during December, 1909, and

January, 1910, I find that plaintiff has not met the burden of proof on it to show that the valuation of $70 per share fixed by the Commissioner was incorrect.

Plaintiff's Claimed Right to Include in Equity Invested Capital, as an Addition to its Accumulated Earnings and Profit, the Difference Between the Face Amount of General Lien Bonds of the Old Company and the Fair Market Value of the Preferred Stock of the New Company

Plaintiff's contention is based upon the premises: (1) that the New Company assumed the obligation of the Old Company to pay the full value of the General Lien Bonds, and (2) that it discharged that obligation by issuing preferred stock in exchange therefor.

■■■ These premises are not sound. The New Company never assumed the obligation of the Old Company to pay the full value of the General Lien Bonds. The record contains no evidence of the assumption of all or any part of the $10,000,000 obligation. All the evidence in the record is to the contrary.

The Foreclosure Decree ordered the mortgaged properties sold subject only to liens superior to the General Lien mortgage, and it forever barred and foreclosed all right, title, estate and interest of the Trustee under the General Lien Mortgage in and to those properties. Plaintiff argues: "The 'foreclosure' decree directed transfer to the purchasers of all right, title and interest of the Trustee to the General Lien and Convertible Mortgage in the Old Company's property. This, of course, included the lien for that mortgage debt." This conclusion is not warranted in fact or in law. The only remedy available to the General Lien bondholders after the foreclosure was a deficiency decree against the Old Company for their unsatisfied claims in excess of $650 per bond. The bondholders did not seek this remedy. No provision was made in the decree or elsewhere for asserting any claim for any unpaid part of the $10,000,000 indebtedness against the purchasers of the property or their assignee.

By its certificate of incorporation the New Company expressly assumed the prior lien debt to which the railroad property to be deeded to it was subject, but made no provision for the assumption of the $10,000,000 of General Lien Bonds. The deed to the New Company conveyed the railroad properties subject only to liens superior to the General Lien mortgage.

The New Company never executed any instrument assuming the indebtedness represented by the General Lien Bonds. Neither the board of directors nor the stockholders of the New Company ever authorized the assumption of that indebtedness.

The original ledger and journal entries of the New Company do not show that these bonds were ever deemed an indebtedness of the New Company. The opening journal entries of the New Company on January 1, 1910, show that the preferred stock was issued to the holders of certificates of deposit for the General Lien Bonds of the Old Company "as provided in Plan of Reorganization". The debit was to "Cost of Property". The general ledger of the New Company contains a separate ledger account for each issue of underlying bonds assumed, but contains no ledger account with respect to the General Lien Bonds.

The first balance sheet of the New Company as of January 1, 1910, published in the application for listing the preferred and common stock, does not show any liability for the General Lien Bonds or reflect any accumulated earnings or profits whatsoever. The fact that the Old Company's books of account carried this liability as of December 31, 1909, and that it was closed out through a cost of property account does not show that the debt was assumed by the New Company. The books of the Old Company did not accrue interest on the General Lien Bonds after the date of the foreclosure decree on October 9, 1909.

They did not even show that the property had been sold.

The witnesses Byrd and Ollinger called attention to some of the closing entries on the books of the Old Company and some of the opening entries on the books of the New Company, and sought to interpret them in particular ways and to draw certain inferences from the way the entries were handled. But, as the Fourth Circuit said in Sitterding v. Commissioner, 80 F.2d 939, 941, "The bookkeeping creates nothing, and the question must be decided according to proven and established facts."

The testimony of the witnesses Ollinger and Byrd discussed the various book entries *in vacuo*. They admitted that they were not competent to interpret the legal effect of the Foreclosure Decree and the various steps taken under the Reorganization Plan. I do not find that the entries in the books, read in the light of the Decree and the Plan, are so ambiguous as to require expert interpretation, and I do not find that the testimony of these witnesses, including that which was admitted subject to exception and subsequently stricken out, has any substantial weight.

The books and records of the New Company offered in evidence were inadequate in many respects. But they certainly do not show that the indebtedness of the Old Company for the $10,000,000 General Lien Bonds was assumed by the New Company, or that the preferred stock of the New Company was issued for the General Lien Bonds or in discharge of the obligation represented by those bonds. On the contrary, the records support the conclusion that the preferred stock was issued for property, and that the liability of the Old Company for the General Lien Bonds was not assumed by the New Company.

The Reorganization Plan, quoted above, and the various papers executed pursuant thereto, taken as a whole, as the Commissioner evidently treated them, show that, under the Plan, the preferred stock and the common stock of the New Company were issued for the property of the Old Company, plus the cash and services referred to in the statement of the Plan. On the other hand, if the general scheme of the Plan is ignored, and the Court proceedings and other documents are taken literally, the preferred stock of the New Company and 8,360 shares of its common stock were issued for the property, 206,854 shares of its common stock were issued for $40 per share, and 24,381.6 shares of its common stock for services. Neither the spirit nor the letter of the transactions supports the contention that the preferred stock was issued for the General Lien Bonds.

Even if the New Company had assumed the obligation of the Old Company to pay the General Lien Bonds and the New Company had issued its preferred stock in discharge of that obligation, it does not follow that plaintiff would be entitled under section 718(a) (4) to include in its equity invested capital as an addition to its "accumulated earnings and profits" the excess of the face value of the bonds over the valuation of the preferred stock which the Commissioner allowed under 718(a) (2). Plaintiff cites no case in direct support of its contention that the provisions of section 718(a) (4) are applicable. Crean Bros. v. Commissioner, 3 Cir., 195 F.2d 257, cited by plaintiff, held that under the facts of that case a cancellation of a debt was properly included in equity invested capital under section 718(a) (2) as a contribution to capital. In that case the debt had been borrowed invested capital. Its cancellation was treated as a contribution by the creditor to the equity invested capital of the debtor, under section 718 (a) (2). Section 718(a) (4), upon which plaintiff relies in the instant case, was not involved.

In the case at bar there was no forgiveness of indebtedness. The most plaintiff claims is that there was an exchange of bonds for preferred stock. Such an exchange, even if made, would not have resulted in a realization of gain, Commissioner v. Capento Securities Corp., 1 Cir., 140 F.2d 382, Alcazar Hotel, Inc., v. Commissioner, 1 T.C. 872,

879, and, therefore, could not be an addition to accumulated earnings and profits. No case has been found involving a reorganization and creation of a new company in which any allowance under section 718(a) (2) or under section 718(a) (4) has been made for more than (a) the value of the stock issued by the New Company when such stock had a fair market value, or (b) the actual value of the property turned in for the stock when the stock had no fair market value. Here the bonds, which plaintiff contends were exchanged for the preferred stock, had the same market value as the preferred stock.

It is true as plaintiff argues, that bonds can constitute property paid in for stock, Victory Glass Inc., v. Commissioner, 11 T.C. 656 and 17 T.C. 381; Walsh Holyoke Steam Boiler Works, Inc., v. Commissioner, 1 Cir., 160 F.2d 185. But whether one considers the fair market value of the stock at the time of issuance, or the value of the bonds as the property paid in, the result is the same, $70 for $100 par or face value. The value of the assets transferred would not be measured by the value at which the old corporation could have included them in its invested capital, but by the value of the claims of the bondholders against the old corporation. Appeal of Nazareth Cement Co., 1926, 4 B.T.A. 1121. See also Bondholders' Committee v. Commissioner, 1942, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784; Fairmount Aluminum Co. v. Commissioner, 4 Cir., 180 F.2d 832; Wells Fargo Bank & Union Trust Co. v. U. S., D.C.N.D.Cal.S.D., 115 F.Supp. 655.

For each of the foregoing reasons, plaintiff was not entitled to include in equity invested capital, as an addition to its accumulated earnings and profit, the difference between the face amount of General Lien Bonds of the Old Company and the fair market value of the preferred stock of the New Company.

### The Cash Paid for the Common Stock of the New Company

Pursuant to the Plan of Reorganization, the New Company sold to the Bankers' Syndicate, $206,854 shares of its common stock at $40 per share, a total of $8,274,160. Also pursuant to the Plan, the Syndicate had offered 50,000 of these shares to the depositing General Lien bondholders at $40 per share, and 156,854 shares to the stockholders of the Old Company at the same price. Most of the 206,854 shares were taken up and paid for by depositing bondholders or stockholders or transferees of the warrants, which were freely traded; the Syndicate took up the balance; and, of course, the Syndicate was obligated to subscribe and pay for the whole 206,854 shares.

The Government stands on the letter of the transaction; it contends that plaintiff is entitled to include in its equity invested capital only the $8,274,160 cash received by the New Company for the issuances of those 206,854 shares; and that the Commissioner allowed plaintiff more than it was entitled to when he allowed it $52.25 per share, or $10,808,121.50, for the 206,854 shares, as part of the securities issued for the package of property, cash, commissions and expenses.

The Commissioner evidently treated the Reorganization Plan as a whole. I have found that the stipulation quoted above under the heading "What the Commissioner Determined" properly interpreted the findings of the Commissioner, and that in Exhibit A, also quoted in full above, the common stock issued by the New Company pursuant to the Plan was broken down into four categories to correspond with the four categories shown on page 5 of the "Reorganization Plan". Such breakdown was not intended to change his basic determination, which was an allowance of $19,518,870.10 as invested capital paid in upon the issuance of the preferred and common stock of the New Company pursuant to the Plan, $7,000,000 of which was allowed for invested capital paid in for 100,000 shares of preferred stock and $12,518,870.10 for invested capital paid in for 239,595.6 shares of common stock. Plaintiff, however, treats each item in

Exhibit A as a separate and specific decision and allowance. It "accepts" the allowance of $52.25 per ·share for the 50,000 shares which were issued under the Plan to the depositing General Lien bondholders on payment of $40 per share, with the Syndicate taking the small balance which was not so subscribed for, although plaintiff admits, or claims, that the allowance of $52.25 per share for those 50,000 shares was too high, and should have been only $40 per share.

But plaintiff seeks to take the second item on Exhibit A literally; it contends that 156,854 shares of common stock valued at $52.25 per share were issued "in exchange for old Common Stock"; and that it is entitled to accept such allowance of $52.25 per share for those 156,854 shares, and to claim, under section 718(a) (1), as a contribution to capital or as paid in surplus, the $40 per share which the stockholders of the Old Company paid for the right to receive those 156,854 shares of common stock of the New Company. Plaintiff further contends that the $6,274,160 cash paid in for the 156,854 shares "was not included in the value of $8,195,621.50 fixed by the Commissioner as the fair market value of the assets of the old company". This contention is unsound. The Commissioner did not "fix" $8,195,621.50 as the fair market value of the assets of the Old Company. He "fixed" $52.25 as the fair market value at January 1, 1910, of the common stock of the New Company and $8,195,621.50 as the fair market value of 156,854 shares of such stock, and $12,518,870.10 as the fair market value of the total of 239,595.6 shares of common stock issued at that time. Plaintiff itself so stipulated.

Of course, the $52.25 value for the common stock of the New Company included the $40 per share cash which was paid in by the original holders or transferees of warrants issued to the General Lien bondholders, as well as by the depositing stockholders of the Old Company or their transferees. That payment was what gave real value to the common stock of the New Company. The Old Company had been hopelessly insolvent in 1908–1909. The foreclosure sale had netted less than two-thirds of the face amount of the $10,000,000 of General Lien Bonds, with nothing left for the $1,800,000 general creditors. The common stock of the Old Company had no substituted value, as was reflected by the market quotations—about $3 per share when the Reorganization Plan was published in July, 1909.

The Committee was a committee representing General Lien bondholders. They were authorized but not required to make some provision for general creditors and common stockholders. They made no provision at all for general creditors, and provided that common stockholders of the Old Company might subscribe for common stock in the New Company at $40 per share, the same price at which depositing bondholders were given the right to subscribe to such stock, obviously upon the theory that they would be the persons most likely to subscribe. It would not have been proper for the Committee to have given anything of substantial value to the stockholders of the Old Company, without making some fair provision for the unsecured creditors. Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, decided by the nisi prius court on March 30, 1909, shortly before the Reorganization Plan in the instant case was presented.

The conclusion that the $52.25 value for the common stock of the New Company includes the $40 per share cash is supported by the quotations on the New York Stock Exchange between July, 1909, and January, 1910, for stock of the Old Company and for warrants for the purchase of common stock of the New Company. In July, 1909, when the Reorganization Plan was announced, the stock was selling around 3, and ranged between 2 and 6 through August and September. In October, after the first

two $10 instalments on account of the $40 had been paid, the deposit receipts and warrants sold around 21. In November, after an additional $10 had been paid, they sold between 31 and 34. In December, after the full $40 had been paid, the range was between 43 and 56. On the last day of December, 1909, the range was 52 to 53, and they opened January 3, 1910, at 52–52¼; and ranged during the month of January between 52⅝ and 47⅜.

■ The Commissioner allowed plaintiff as much or more than it was entitled to when he allowed $52.25 per share, or $10,808,121.50, for the 206,854 (50,000 plus 156,854) shares of common stock of the New Company issued to the depositing stockholders and bondholders of the Old Company upon payment by them of $40 per share, with the Syndicate taking up the small balance not subscribed for by such bondholders and stockholders. The allowance by the Commissioner obviously included the $40 per share of cash, and plaintiff is not entitled to an additional allowance for that amount.

If the Plan and the transactions pursuant thereto be taken literally, the 156,-854 shares of stock were issued for $40 cash. If the spirit of the Plan is given effect, it appears that the Committee gave the depositing stockholders of the Old Company a right to subscribe to stock in the New Company which had some value, probably $3 per share, certainly never over $12.50 per share. Plaintiff's argument that the stockholders of the Old Company owned the equity in the properties after the foreclosure sale ignores both the letter and substance of the transaction. Under the letter of the transactions, they had been wiped out and had only the right to buy new stock. Under the substance of the transaction, various groups had an equity to receive common stock of the New Company, namely, (1) coupon holders, (2) holders of warrants to subscribe originally issued to depositing bondholders, (3) holders of warrants to subscribe originally issued to depositing stockholders of the Old Company, and (4) the bankers and syndicate members, with respect to (a) the stock being issued to them for their services and commissions, and (b) the balance of stock they had to take up themselves under the agreement. That equity was not worth $12,518,870.-10 unless you include in the $12,518,870.-10 the $8,274,160.00 cash necessary to make the Plan effective.

Plaintiff has not shown that it is entitled to more than the Commissioner allowed it for the 156,854 shares or any other shares of the common stock.

### The Stock Issued for Commissions and Expenses

24,381.6 of the 239,595.6 shares of common stock issued by the New Company pursuant to the Reorganization Plan were issued for "expenses of reorganization, compensations, underwriting and other commissions and for reserve". Treating the Plan as a whole, as I have found he did in determining its equity invested capital, the Commissioner allowed plaintiff $52.25 per share for the entire 239,596.6 shares so issued; although if the allowance should be broken down, as plaintiff contends, there would have been no authority under the Excess Profits Tax Law for any allowance for stock issued for services.

In its original answer the Government did not raise the point that no allowance should have been made for the 24,381.6 shares. But before and at the beginning of the trial, the Government gave plaintiff notice that it expected plaintiff to substantiate its right to include this component in its equity invested capital as an element of its claim to an overpayment of taxes, and during the trial submitted an amended answer in each case raising the question. Plaintiff objected to the proposed amendments, and I reserved ruling until after briefs and argument.

Rule 15(a), F.R.Civ.P., 28 U.S.C. provides: "A party may amend his pleading once as a matter of course at any time

before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders."

Plaintiff's position seems to be that the Government cannot raise the point that no allowance should have been made for stock issued for commissions and expenses unless the Commissioner has made a "redetermination" or "reaudit" of the tax liability. But the Government is not seeking to collect any additional tax from plaintiff, nor to set off an alleged overpayment for one tax year against an alleged overpayment for another, cf. McEachern v. Rose, 302 U.S. 56, 58 S.Ct. 84, 82 L.Ed. 46, nor even to raise an affirmative defense such as fraud, cf. Powell v. U. S., 9 Cir., 123 F. 2d 472. The Government is simply standing on the ground that an action for refund of taxes is governed by equitable principles, and that a taxpayer may not capitalize upon a mistaken determination of the Commissioner where the evidence fails to show that the taxpayer has overpaid his taxes for the year in question. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293; Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L. Ed. 1265; Ryan v. Alexander, 10 Cir., 118 F.2d 744; U. S. v. Pfister, 8 Cir., 205 F.2d 538; Alexander Sprunt & Son, Inc., v. Commissioner, 4 Cir., 64 F.2d 424; Tait v. Safe Deposit & Trust Co., 4 Cir., 70 F.2d 79.

Leave is hereby granted to the Government to file the amended answers.

Plaintiff admits that it cannot prove that the 24,381.6 shares were issued for property paid in. It could not even prove the allocation of these shares. The books and records do not show who received these shares or even that they were received by the Reorganization Committee.

The Agreement between the Committee and Blair & Co. merely indicated that $827,416 par value common stock was to be issued to the Syndicate Managers as a commission, and that $200,000 par value common stock was to be issued to the Bankers as compensation. It is possible that this included $50,000 par value common stock issued to the five incorporators. It is also possible that all of these shares were issued for services of the Reorganization Committee.

The statutory concept of invested capital includes "actual cash", "actual cash value of tangible property" and "the acquirement of something of permanent use or value in the business." LaBelle Iron Works v. United States, 1921, 256 U.S. 377, 389, 41 S.Ct. 528, 529, 65 L.Ed. 998; Willcutts v. Milton Dairy Co., 1927, 275 U.S. 215, 48 S.Ct. 71, 72 L.Ed. 247; Gauley Mt. Coal Co. v. Commissioner, 4 Cir., 23 F.2d 574, 576.

The market value of the stock issued to bankers or underwriters cannot be included in equity invested capital. Warner Co., 11 T.C. 419; Palomar Laundry Co., 7 T.C. 1300.

In Bard-Parker Co. v. Commissioner, 2 Cir., 218 F.2d 52, affirming 18 T.C. 1255, the Court said, 218 F.2d at page 58:

"* * * We think the Tax Court correctly excluded, from taxpayer's 'equity invested capital,' the market value of the shares of common stock issued to Ladd in exchange for services. For Section 718(a) (2) of 26

U.S.C., 1946 ed. is explicitly restricted to 'property * * * previously paid in'; and services have been held not to constitute 'property' for such purposes. La Belle Iron Works v. United States, 256 U.S. 377, 389, 41 S.Ct. 528, 65 L.Ed. 998; Simmons Company v. Commissioner, 1 Cir., 33 F.2d 75. Taxpayer argues that Section 69 of the New York Stock Corporation Law provides for the issuance of stock for 'labor done' as well as for money or property actually received. We think such a state statute irrelevant in interpreting the provisions of the Federal Revenue Act here applicable."

It follows that if the terms on Exhibit A be treated as separate determinations, the allowance of $1,273,938.60 for the 24,381.6 shares was improper, and should not be included in plaintiff's equity invested capital. It can only be justified by treating all of the stock of the New Company, common and preferred, as having been issued for a package of property and cash and the services and expenses necessary to prepare the package.

There is much to be said for treating the Plan as a whole, and doing just what the Commissioner did. It is the common sense way of handling the situation, and gives effect to the substance and spirit of the Reorganization Plan.

But it is not necessary to decide whether the original decision of the Commissioner or the present position of the Government is correct. Plaintiff has not shown that it is entitled to a larger allowance for equity invested capital than the amount allowed it by the Commissioner. The Government is making no claim for additional taxes. Therefore, whether the original allowance of the Commissioner was correct or whether he should have allowed a smaller amount, as the Government now contends, plaintiff is not entitled to any refund of taxes in these cases, and the judgments must be for the defendant, with costs. It is so ordered.